**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 15, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STEPHEN HAMER,

     Plaintiff - Appellant,

v.

CITY OF TRINIDAD,

     Defendant - Appellee.

------------------------------

COLORADO MUNICIPAL LEAGUE,

     Amicus Curiae.

No. 17-1456

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CV-02545-NYM-KMT)**
_____

Garrett S. DeReus (Andrew D. Bizer with him on the briefs), Bizer & DeReus, New Orleans, Louisiana, for Plaintiff-Appellant.

Marni Nathan Kloster (Nicholas C. Poppe with her on the brief), Nathan Dumm & Mayer P.C., Denver, Colorado, for Defendant-Appellee.

Wynetta P. Massey and Lindsay M. Rose, Special Counsel for Colorado Municipal League, Office of the City Attorney, Colorado Springs, Colorado, and Dianne M. Criswell, Attorney for Colorado Municipal League, Denver, Colorado, filed a brief for Amicus Curiae in support of Defendant-Appellee.

_____

Before **BRISCOE**, **BACHARACH**, and **CARSON**, Circuit Judges.
_____

**CARSON**, Circuit Judge.

_____

Title II of the Americans with Disabilities Act ("ADA") mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, section 504 of the Rehabilitation Act of 1973 ("RA") mandates in part that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

Today we consider exactly when and how a public entity violates these two statutes.[1]  The answer, in turn, affects how the applicable statutes of limitations operate.  Does a public entity violate Title II and section 504 only when it *initially* constructs or creates a non-compliant service, program, or activity?  If so, a single statute of limitations accrues from the day a qualified individual with a disability first discovers he or she has been injured by the service, program, or activity.  The statute of limitations, in this scenario, would bar any lawsuit brought after the limitations period ends.

_____

[1] Unless we say otherwise, when we use the term "public entity," we are referring to both public entities under Title II and programs or activities that receive federal financial assistance under section 504.

Or does a public entity violate Title II and section 504 *repeatedly* until it affirmatively acts to remedy the non-compliant service, program, or activity? In that situation, a qualified individual's initial discovery that he or she has been injured does not trigger just one statute of limitations that bars any lawsuit brought after the limitations period ends. Rather, because the public entity commits a new violation (and the qualified individual experiences a new injury) each day that it fails to act, the statute of limitations effectively functions as a "look-back period," Burlington N. & Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1028–29 (10th Cir. 2007), restricting an individual's right to relief to those injuries suffered (1) during the limitations period immediately prior to filing suit and (2) while the suit is pending.

We hold that a public entity violates Title II of the Americans with Disabilities Act and section 504 of the Rehabilitation Act each day that it fails to remedy a non-compliant service, program, or activity. As a result, the applicable statute of limitations does not operate in its usual capacity as a firm bar to an untimely lawsuit. Instead, it constrains a plaintiff's right to relief to injuries sustained during the limitations period counting backwards from the day he or she files the lawsuit and injuries sustained while the lawsuit is pending. Because the district court applied a different and incorrect standard, we reverse and remand for further proceedings.

I.

Plaintiff Stephen Hamer resides in Trinidad, Colorado; is confined to a motorized wheelchair due to what he characterizes as "severe bilateral ankle problems"; and, for purposes of this appeal, is a qualified individual with a disability

3

under Title II of the ADA and section 504 of the RA. He does not own a car or otherwise use public transportation. Instead, he primarily utilizes the City of Trinidad's public sidewalks to move about in his wheelchair.

Plaintiff contends many of the City's sidewalks and the curb cuts allowing access onto those sidewalks do not comply with Title II of the ADA and section 504 of the RA. Indeed, at a City Council meeting he attended in April 2014, Plaintiff informed City officials that he had personally counted seventy-nine non-compliant sidewalks and curb cuts throughout the city. Further, at the end of that same month, Plaintiff filed an ADA complaint with the United States Department of Justice ("DOJ") informing the government about the state of the City's sidewalks and curb cuts.

Plaintiff continued to lodge informal ADA and RA complaints at City Council meetings over the next few months. And at some point after he lodged his ADA complaint with the DOJ, the DOJ audited the City and discovered multiple non-compliant sidewalks and curb ramps. Apparently in response to Plaintiff's multiple complaints and the results of the DOJ's audit, City officials actively began repairing and amassing funding to further repair non-compliant sidewalks and curb cuts.

Even so, Plaintiff nonetheless filed the present lawsuit against the City on October 12, 2016, for violations of Title II of the ADA and section 504 of the RA. Like the complaint he filed with the DOJ, Plaintiff complains of the City's allegedly deficient sidewalks and curb cuts. He thus seeks a declaratory judgment that the City's sidewalks and curb cuts violate the ADA and RA, injunctive relief requiring

4

City officials to remedy the City's non-compliant sidewalks and curb cuts, monetary damages, attorneys' fees, and costs.

The district court granted summary judgment to the City on statute-of-limitations grounds. The district court first observed that because neither Title II nor section 504 explicitly provided for a statute of limitations, Colorado's general two-year statute of limitations governed Plaintiff's claims. See E.E.O.C. v. W.H. Braum, Inc., 347 F.3d 1192, 1197 (10th Cir. 2003) ("Where Congress creates a cause of action without specifying the time period within which it may be brought, courts may infer that Congress intended the most analogous state statute of limitations to apply."); see also Colo. Rev. Stat. § 13-80-102 (establishing Colorado's general two-year statute of limitations). The district court then noted the general rule in federal court that "[t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." Alexander v. Oklahoma, 382 F.3d 1206, 1215 (10th Cir. 2004) (alteration in original) (quoting Indus. Constructors Corp. v. U.S. Bureau of Reclamation, 15 F.3d 963, 969 (10th Cir. 1994)). With that rule in mind, the district court concluded that Plaintiff must have "discovered" or "encountered" the City's non-compliant sidewalks and curb cuts no earlier than October 12, 2014—i.e., two years before the day he filed his lawsuit—to survive summary judgment.

The district court determined, however, that Plaintiff's claims most likely accrued in April 2014 when Plaintiff first raised his concerns about the City's sidewalks and curb cuts at the City Council meeting and with the DOJ. In any event,

5

the district court also determined that Plaintiff's claims must have begun to accrue "at the very latest[] in August 2014" when he raised his concerns at a City Council meeting for the final time. At one of these two points—either April or August 2014—Plaintiff was undoubtedly "aware of the nature and extent of the City's discrimination." Thus, because both of these dates occurred before October 12, 2014, the district court held that the two-year statute of limitations barred Plaintiff's Title II and section 504 claims.

The district court explicitly rejected Plaintiff's argument that the continuing violation doctrine could salvage his claims from being untimely. This doctrine applies "'when the plaintiff's claim seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act,' as opposed to 'conduct that is a discrete unlawful act.'" Sierra Club v. Okla. Gas & Elec. Co., 816 F.3d 666, 672 (10th Cir. 2016) (quoting Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir. 2009)). Stated differently, "one violation continues when 'the conduct as a whole can be considered as a single course of conduct.'" Id. (quoting Birkelbach v. SEC, 751 F.3d 472, 479 n.7 (7th Cir. 2014)). The utility of the continuing violation doctrine lies in the fact that as long as one of the separate wrongful acts contributing to the collective conduct "occurs within the filing period," a court may consider "the *entire* time period"—including those separate acts falling outside the filing period— "for the purposes of determining liability." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) (emphasis added).

6

An important caveat to the continuing violation doctrine, however, is that it "is triggered 'by continual unlawful acts, not by continual ill effects from the original violation.'" Mata v. Anderson, 635 F.3d 1250, 1253 (10th Cir. 2011) (quoting Parkhurst v. Lampert, 264 F. App'x 748, 749 (10th Cir. 2008) (unpublished)). And according to the district court, the allegedly unlawful acts at issue in Plaintiff's lawsuit—"the construction and alleged lack of maintenance of noncompliant sidewalks and curb cuts"—were discrete, as opposed to continual, acts. As a result, the district court concluded that "any subsequent injury caused by the City's failure to remediate these issues" after Plaintiff discovered or encountered them simply amounted to "continual ill effects" of those original violations. Thus, the district court reasoned that the continuing violation doctrine could not apply to Plaintiff's claims.

The district court also denied Plaintiff's additional argument that, regardless of whether the continuing violation doctrine applied, his claims remained timely because the City "violate[d] both statutes each day" that it failed to remedy its non-compliant sidewalks and curb cuts. In Plaintiff's opinion, such repeated violations meant that he suffered injuries each day he was unable to access the sidewalks and curb cuts until the day he filed suit. Under this theory, the two-year statute of limitations did not bar Plaintiff's suit completely. Instead, he could obtain relief for injuries he suffered after October 12, 2014, but not for any injuries he suffered before that day.

The district court rejected Plaintiff's argument, concluding that "it [was] insufficient to rely solely on the continued inaccessibility of the City's sidewalks and curb cuts" for Plaintiff to show he suffered an injury or injuries after October 12, 2014.

7

Indeed, the district court again characterized the continued inaccessibility as "continued ill effects" of Plaintiff's original encounters or discoveries of the City's alleged discrimination. The district court therefore reaffirmed its belief that Plaintiff needed to point to "*discrete acts* of discrimination he encountered since October 12, 2014," to survive summary judgment. And because Plaintiff had not directed the district court to any evidence suggesting that he encountered or discovered any new, non-compliant sidewalks and curb cuts after October 12, 2014, the district court stood firm in its conclusion that Plaintiff's Title II and section 504 claims were untimely.

Plaintiff now appeals the district court's ruling that Colorado's two-year statute of limitations bars his Title II and section 504 claims.[2] Our jurisdiction arises under 28 U.S.C. § 1291, and our review is de novo. Sierra Club, 816 F.3d at 671. Further, because Title II and section 504 essentially "involve the same substantive standards, we analyze them together." Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch., 565 F.3d 1232, 1245 (10th Cir. 2009).

II.

Before launching into our analysis, we first take a moment to explain in more detail the difference between the two arguments Plaintiff made in the district court and how that difference affects our ultimate disposition of his appeal.

---

[2] Neither party disputes that the applicable limitations period is two years in length or that it derives from section 13-80-102 of the Colorado Revised Statutes. We thus assume the same for purposes of this appeal.

As discussed above, the "continuing violation" doctrine—Plaintiff's first argument to the district court—tethers conduct from both inside and outside the limitations period into one single violation that, taken as a whole, satisfies the applicable statute of limitations.[3] Sierra Club, 816 F.3d at 672. To help illustrate this concept, we borrow a useful visual aid from attorney Kyle Graham's law review article "The Continuing Violations Doctrine":



This figure "illustrates how [the continuing violation doctrine] combines otherwise discrete occurrences A through E, of which only D and E occurred within the limitations period, into a single, timely claim A." Kyle Graham, The Continuing Violations Doctrine, 43 Gonz. L. Rev. 271, 280 (2008).

---

[3] Unlike the typical custom in our circuit, other courts and scholars have sometimes added a word and referred to this doctrine as the "pure" continuing violation doctrine. See, e.g., White v. Mercury Marine, Div. of Brunswick, Inc., 129 F.3d 1428, 1430 (11th Cir. 1997); Kyle Graham, The Continuing Violations Doctrine, 43 Gonz. L. Rev. 271, 283 (2008).

By contrast, we have referred to the second argument Plaintiff made to the district court as the "repeated violations" doctrine.[4] Sierra Club, 816 F.3d at 671. Unlike the continuing violation doctrine, the repeated violations doctrine "*divides what might otherwise represent a single, time-barred cause of action into several separate claims, at least one of which accrues within the limitations period prior to suit.*" Graham, supra, at 275 (emphasis added). That division, in turn, "allows recovery for only that part of the injury the plaintiff suffered during the limitations period"; recovery for the part of the injury suffered outside of the limitations period, however, remains unavailable. White v. Mercury Marine, Div. of Brunswick, Inc., 129 F.3d 1428, 1430 (11th Cir. 1997); see also, e.g., Figueroa v. D.C. Metro. Police Dep't, 633 F.3d 1129, 1135 (D.C. Cir. 2011) (addressing how repeated violations influence the statute of limitations); Provident Mut. Life Ins. Co. of Phila. v. City of Atlanta, 864 F. Supp. 1274, 1284–85 (N.D. Ga. 1994) (describing an instance of the repeated violations doctrine at work and observing that the plaintiff "may secure only actual damages incurred within the [limitations period] preceding the date upon which the action was filed"); Russo Farms, Inc. v. Vineland Bd. of Educ., 675 A.2d 1077, 1084 (N.J. 1996) (same). Mr. Graham again provides a useful visual aid that illustrates just how this doctrine operates. As shown below, the repeated violations doctrine "transforms what would otherwise represent a single, time-barred claim A

---

[4] Other courts and scholars have sometimes referred to this doctrine as the "modified" continuing violation doctrine. See, e.g., White, 129 F.3d at 1430; Graham, supra, at 283.

10

into a series of fresh claims, identified as claims B, C, D, etc." Graham, supra, at 281.



Notably, although Plaintiff argued in the district court that both the continuing violation doctrine and the repeated violations doctrine could make timely his claims under Title II of the ADA and section 504 of the RA, on appeal he argues only for application of the repeated violations doctrine.[5] Indeed, in his Opening Brief, Plaintiff argues that

> *[e]ach time* [he] was denied access to [the sidewalks and curb cuts], the City of Trinidad committed discrimination within the meaning of the ADA/§504 and a claim for damages arose under the statute. [Plaintiff] experienced recurrent discrimination by the City of Trinidad both inside and outside of the statute of limitations period. *Accordingly, [Plaintiff] had some claims that are timely and some that are time barred*.

---

[5] Plaintiff, in other words, abandoned his continuing violations argument on appeal. We thus do not consider it. See United States v. Yelloweagle, 643 F.3d 1275, 1280 (10th Cir. 2011) ("[W]here [an appellant] raises an issue before the district court but does not pursue it on appeal, we ordinarily consider the issue waived.").

Pl.'s Opening Br. 7 (emphases added).  This language is a clear reference to the repeated violations doctrine.

Although Plaintiff abandons the continuing violation doctrine on appeal, the City continues to view the case in that context.  In the City's view, the Supreme Court's analysis of the continuing violation doctrine in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), is controlling.  In Morgan, the Supreme Court considered how statutes of limitations apply to various claims under Title VII of the Civil Rights Act of 1964.   For hostile work environment claims, the Supreme Court held that "consideration of the entire scope of [the] claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period."  Id. at 105.  The Supreme Court reasoned that hostile work environment claims "cannot be said to occur on any particular day" and instead "occur[] over a series of days or perhaps years."  Id. at 115.  Because "[s]uch claims are based on the cumulative effect of individual acts," "[i]t does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period."  Id. at 115, 117.

The City argues that Morgan precludes us from applying the continuing violation doctrine to Plaintiff's Title II and section 504 claims because the City subjected him to only "discrete acts of discrimination" that "did not require proof" of the cumulative effect of individual acts.  Def.'s Resp. Br. 11.  Although that argument is correct, it misses the mark insofar as it assails an argument Plaintiff does

12

not make on appeal. Contrary to the way the City frames the issue, Plaintiff does not contend that he should be able to aggregate separate acts into one single, comprehensive violation. Instead, he argues that he may recover for injuries he suffered inside of the limitations period but not for injuries he suffered outside of the limitations period—that is, he is arguing for application of the repeated violations doctrine. Morgan, therefore, is inapposite to this appeal because it did not involve the repeated violations doctrine. Indeed, the language of that case—e.g., that hostile work environments are made up of "component acts" and "are based on the cumulative effect of individual acts"—makes it clear it was immediately concerned with interpreting and applying the continuing violation doctrine.

The City further relies on our unpublished decision in Rhodes v. Langston University, 462 F. App'x 773 (10th Cir. 2011). In Rhodes, the plaintiff argued that the alleged Title II and section 504 violations at issue could not "be tied to specific dates as all were on-going events." Id. at 780. He thus argued that the district court erred in concluding that the applicable two-year statute of limitations barred *any* of his claims—including those based on acts that occurred outside of the limitations period—because they amounted to "a continuation . . . of related and repetitive unlawful acts or practices" that only concluded within that two-year period. Id. Although we ultimately determined that the plaintiff's argument had no merit, that determination does not bear upon the outcome of Plaintiff's current appeal before us today. Like the Supreme Court's language in Morgan, our language in Rhodes shows that we were concerned in that case with whether the continuing violation doctrine,

13

not the repeated violations doctrine, applied to Title II and section 504 claims. Thus, the City's attempt to analogize Plaintiff's arguments to Rhodes is equally unconvincing.

Finally, the City directs us to Foster v. Morris, 208 F. App'x 174 (3d Cir. 2006) (unpublished). In that case, the Third Circuit concluded that the continuing violation doctrine, not the repeated violations doctrine, does not apply to Title II claims. See, e.g., id. at 177 ("The continuing violations doctrine is an equitable exception to a strict application of a statute of limitations where the conduct complained of consists of a pattern that has only become cognizable as illegal over time."); id. at 177–78 ("When a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." (internal quotation marks and alterations omitted)). And interestingly enough, although Foster did not address the repeated violations doctrine outright, Foster's underlying reasoning actually supports—or, at the very least, leaves room open for—that doctrine in the Title II and Section 504 context. Indeed, the Third Circuit concluded that the plaintiff in that case was "still entitled to recover for any violations that occurred during" the limitations period even though he could not recover for any violations that occurred

outside that period.  Id. at 178.  That logic is perfectly consistent with the repeated violations doctrine.  So no matter how we slice it, Foster cannot help the City.[6]

Because none of the cases the City cites resolve whether the repeated violations doctrine applies to Plaintiff's claims under Title II and section 504, we turn to the statutory text to decide this matter of first impression in our circuit.

### III.

We hold that the repeated violations doctrine applies to claims under Title II of the Americans with Disabilities Act and section 504 of the Rehabilitation Act of 1973.  As we explain below, a public entity repeatedly violates those two statutes each day that it fails to remedy a non-compliant service, program, or activity. Accordingly, a qualified individual with a disability is excluded from the participation in, denied the benefits of, and subjected to discrimination under the service, program, or activity each day that she is deterred from utilizing it due to its non-compliance.  She stops suffering a daily injury only when the public entity

---

[6] Although neither party cites it, we also note that the Fifth Circuit's decision in Frame v. City of Arlington, 657 F.3d 215 (5th Cir. 2011) (en banc), does not bear on Plaintiff's present appeal.  The Frame court held that a single cause of action accrues under Title II and section 504 when the plaintiff "has sufficient information to know that he has been denied the benefits of a service, program, or activity of a public entity."  Id. at 238.  One may think that holding amounts to a rejection of the repeated violations doctrine.  But the question whether the repeated violations doctrine applies to Title II claims was not before the court in Frame.  Indeed, Frame *only* considered whether a Title II cause of action accrues when the plaintiff discovers he has been injured or when the public entity engaged in the wrongful act that caused the injury.  Id. at 238–40.  Nothing in its holding rejects or is inconsistent with the repeated violations doctrine.  Thus, for our purposes today, Frame is of limited value.

15

remedies the non-compliant service, program, or activity or when she no longer evinces an intent to utilize it. The practical effect is that, once the individual sues under Title II or section 504, the statute of limitations bars recovery only for those injuries she incurred outside of the limitations period immediately preceding the day of suit; it does not, however, bar recovery for injuries she incurred within that limitations period or after she files suit.

## A.

Our starting point is the plain language of Title II and section 504. See Levorsen v. Octapharma Plasma, Inc., 828 F.3d 1227, 1231 (10th Cir. 2016). If that language is "clear and unambiguous," then "our duty is simply to enforce the statute that Congress has drafted." United States v. Brown, 529 F.3d 1260, 1264 (10th Cir. 2008) (quoting United States v. Ortiz, 427 F.3d 1278, 1282 (10th Cir. 2005)). Significantly, though, "the meaning of statutory language, plain or not, depends on context." First Nat'l Bank of Durango v. Woods (In re Woods), 743 F.3d 689, 694 (10th Cir. 2014) (quoting United States v. Villa, 589 F.3d 1334, 1343 (10th Cir. 2009)). We thus need not constrain ourselves to the "language itself" in determining whether Title II and section 504 clearly and unambiguously convey when and how often a public entity violates these two statutes. Salazar v. Butterball, LLC, 644 F.3d 1130, 1137 (10th Cir. 2011) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)). Rather, we may also look to "the specific context in which that language is used" and "the broader context of the statute as a whole." Id. (quoting Robinson, 519 U.S. at 340). Both the text and structure of the statutes guide our decision today.

16

Consider first the specific language. Title II mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Likewise, section 504 mandates in part that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Obviously, neither of these statutes state outright when or how often a public entity violates them. They simply command that no qualified individual may "be excluded" from, "be denied" the benefits of, or "be subjected" to discrimination under a service, program, or activity. With that said, that language is phrased in the present tense (albeit in the passive voice), which suggests that a qualified individual who *currently* experiences discrimination under Title II or section 504 suffers an injury. And so the same language also suggests that a qualified individual suffers new discrimination and a new injury *each day* that she cannot utilize a non-compliant service, program, or activity—even if the barriers giving rise to her claim were ones she encountered before. After all, if sidewalks and curb cuts actually do constitute a service, program, or activity of a public entity—a question that we express no opinion on today—a qualified individual with a disability would still "be excluded" from utilizing any given sidewalk or curb cut each day that it remained non-

17

compliant.[7]  Likewise, that same individual would still "be denied" the benefits of that sidewalk or curb cut when she encountered it a day ago just as much as when she first encountered it a year ago.  Cf. Pickern v. Holiday Quality Foods Inc., 293 F.3d 1133, 1136 (9th Cir. 2002) (interpreting the phrases "is being subjected to" and "is about to be subjected to" in the enforcement provision of Title III of the ADA and concluding that they "make[] clear that either a continuing or a threatened violation of the ADA is an injury within the meaning of the Act"); Scherr v. Marriott Int'l, Inc., 703 F.3d 1069, 1075–76 (7th Cir. 2013) (relying on Pickern and concluding the same).

To the extent any real or perceived gaps remain in the statutory text, the Supreme Court's Title II jurisprudence fills them.  In Tennessee v. Lane, 541 U.S. 509 (2004), the Supreme Court recognized "that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion."  Id. at 531 (citing 42 U.S.C. § 12131(2)).  Title II therefore imposes "an affirmative obligation to accommodate persons with disabilities."  Id. at 533.[8]

_____

[7] We assume only for the purposes of this appeal that sidewalks and curb cuts constitute a service, program, or activity.

[8] As Plaintiff points out, numerous regulations implementing the ADA reflect this principle.  See, e.g., 28 C.F.R. § 35.133(a) ("A public entity shall maintain in operable working condition those features of facilities and equipment that are *required to be readily accessible to and usable by* persons with disabilities . . . ." (emphasis added)); id. § 35.150(a) ("A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, *is readily accessible to and usable by* individuals with disabilities." (emphasis added)); id. § 35.150(d) (allowing public entities to create a multi-year plan to remove existing barriers); id. § 35.151(b)(1) ("Each facility or part of a

This "duty to accommodate," id. at 532, solidifies that Title II (and, by extension, section 504) clearly and unambiguously conveys that a non-compliant service, program, or activity gives rise to repeated violations.[9]  Failing to act in the face of an affirmative duty to do so axiomatically gives rise to liability.  Cf., e.g., Restatement (First) of Torts § 284 (1934) ("Negligent conduct may be . . . a failure to do an act which is necessary for the . . . assistance of another and which the actor is under a duty to do."); Restatement (Second) of Torts § 824 (1979) ("The conduct necessary to make the actor liable for . . . nuisance may consist of . . . a failure to act under circumstances in which the actor is under a duty to take positive action . . . .").  Further, if the actor under the affirmative duty *keeps* failing to act while the underlying problem remains unremedied, then every day's inaction amounts to a new violation.  Cf., e.g., Grant, 505 F.3d at 1028 (observing that continuing temporary nuisances "give[] rise over and over to new causes of action" until they are abated (internal quotation marks and alteration omitted)).  Thus, even though "adverse effects resulting from" a single, original violation do not trigger the repeated

_____

facility . . . shall . . . *be altered* in such manner that the altered portion of the facility *is readily accessible to and usable by* individuals with disabilities." (emphases added)).

[9] In addition to the fact that we analyze Title II and section 504 claims together, Miller ex rel. S.M., 565 F.3d at 1245, the language of the RA itself also suggests an affirmative duty to accommodate.  See, e.g., 29 U.S.C. § 701(c)(2) (requiring "the use of accessible formats" for qualified individuals with disabilities); see also Alexander v. Choate, 469 U.S. 287, 301 (1985) (observing that qualified individuals with disabilities under the RA are entitled to "meaningful access" and "reasonable accommodations").

19

violations doctrine when they do not constitute violations in their own right, Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 628 (2007), overturned on other grounds by The Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111–2, 123 Stat. 5 (2009), claims under Title II (and section 504 by extension) do not fit that rubric. Rather, a public entity *does* commit a "new violation" each day that it fails to remedy a non-compliant service, program, or activity. The affirmative, ongoing duty that Title II and section 504 place upon it mandates as much. Id. [10,11]

---

[10] The City notes and relies on the Fourth Circuit's opinion in A Society Without A Name v. Virginia, 655 F.3d 342 (4th Cir. 2011), which concluded that a claim under Title II did not trigger the principles of the repeated violations doctrine because that claim only gave rise to "the continuing ill effects of [one] original violation." Id. at 348–49. We do not find that case persuasive, however, because it never factored in the mandate that Title II imposes an affirmative duty to accommodate. See id.

[11] At this point, we believe that an analogy to temporary nuisance claims—one of the "touchstone" instances of the repeated violations doctrine at work, Graham, supra, at 308—can further illustrate our rationale. A temporary nuisance exists "[w]here the injury from the alleged nuisance . . . is of a continuing or recurring character." 58 Am. Jur. 2d Nuisances § 221 (2018). "In such a case, every day's continuance is a new nuisance," id., that "gives rise over and over to new causes of action," Grant, 505 F.3d at 1028 (internal quotation marks and alteration omitted). The practical effect is that "a new statute of limitations begins to run . . . after *each* new injury," 58 Am. Jur. 2d Nuisances § 253 (2018) (emphasis added), and the *final* statute of limitations accrues only when the temporary nuisance is remedied once and for all. See Grant, 505 F.3d at 1028. Thus, so long as the temporary nuisance continues unabated, a plaintiff bringing suit is effectively doing so on "day one" of a new limitations period, which enables her to seek damages for past injuries sustained "within the limitations period immediately prior to suit." Id. (internal quotation marks omitted).

So too here. Each time a qualified individual with a disability is excluded from, denied the benefits of, or subjected to discrimination under a service, program, or activity, he suffers an injury under Title II and section 504. For the reasons we explained above, this injury is not a one-time event; rather, it repeatedly occurs so long as the service, program, or activity remains non-compliant and the qualified

20

The broader statutory context of the ADA and RA bolsters this conclusion. Consider, for example, 42 U.S.C. § 12101, which outlines Congress's express statutory purposes for enacting the ADA. There, Congress noted that "the Nation's proper goals regarding individuals with disabilities are to assure . . . full participation . . . for such individuals." 42 U.S.C. § 12101(a)(7). Congress made a similar conclusion earlier when it enacted 29 U.S.C. § 701, which lists the purposes of the RA. In that statute, Congress noted that it hoped to achieve "full inclusion and integration in society" for individuals with disabilities and that an entity charged with carrying out the RA should always consider "the principle[] of . . . full participation of the individuals." 29 U.S.C. § 701(a)(6)(B), (c)(3).

Congress's goals of full participation, inclusion, and integration for qualified individuals with disabilities are consistent with and suggestive of the repeated violations doctrine. A qualified individual is not a full participant or fully included in a service, program, or activity if she cannot utilize it in a similar way as persons without disabilities, and that does not change simply because she was deterred from utilizing the service, program, or activity many times before. What matters is whether the individual can fully participate *now* in the service, program, or activity. The repeated violations doctrine, in turn, accounts for that reality—and, for that matter, encourages public entities to comply with their affirmative and ongoing

---

individual is aware of that and deterred from utilizing it. So when a Title II or section 504 plaintiff brings suit, he is essentially doing so on the first day of a new limitations period.

21

obligations to accommodate—by giving a qualified individual an avenue for relief any moment that he or she cannot fully participate or is not fully included in a service, program, or activity.

Congress further observed in enacting the ADA that "the *continuing existence* of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous . . . ." 42 U.S.C. § 12101(a)(8) (emphasis added). It also noted that it hoped "to address the major areas of discrimination *faced day-to-day* by people with disabilities." Id. § 12101(b)(4) (emphasis added). Similarly, when it previously enacted the RA, Congress had discerned that "individuals with disabilities *continually encounter* various forms of discrimination." 29 U.S.C. § 701(a)(5) (emphasis added). This language demonstrates that Congress understood that a public entity could repeatedly cause a qualified individual with a disability to suffer an injury from the same service, program, or activity. Certainly, nothing in the text of Title II or section 504 suggests otherwise.

The statutory text and the Supreme Court's pronouncements make one thing clear: Congress did not design the ADA or the RA so that a public entity could forever prevent a qualified individual with a disability from utilizing a service, program, or activity. Yet the City argues for that exact result. The City contends that because Plaintiff filed suit more than two years after he first encountered the allegedly non-compliant sidewalks and curb cuts, the statute of limitations forever bars him from forcing the City to live up to its affirmative duty and correct those

22

barriers. That proposition simply cannot fit within the language, structure, and purpose of the ADA or the RA.

In conclusion, based on the plain language of Title II of the ADA and section 504 of the RA, Supreme Court jurisprudence interpreting Title II, and Congress's express statutory purposes in enacting the ADA and RA, we hold that Title II and section 504 clearly and unambiguously require us to acknowledge they are subject to the repeated violations doctrine.[12] Accordingly, each time a qualified individual with a disability encounters or "actually become[s] aware of" a non-compliant service, program, or activity "and is thereby deterred" from utilizing that service, program, or activity, he or she suffers discrimination and a cognizable injury. Pickern, 293 F.3d

---

[12] Because Title II and section 504 are unambiguous in this regard, we have no reason to consider "the underlying public policy" of either statute. United States v. Manning, 526 F.3d 611, 614 (10th Cir. 2008) (quoting United States v. LaHue, 170 F.3d 1026, 1028 (10th Cir. 1999)); see also id. ("If the statutory language is clear, our analysis ordinarily ends."). Even so, we observe as a side note that applying the repeated violations doctrine to claims under Title II and section 504 serves the interests of efficiency. In Title II and section 504 cases, "more than just the rights of the plaintiff before the court are at stake." Graham, supra, at 321. Indeed, many other qualified individuals with disabilities also benefit from a ruling favorable to the plaintiff. To use this case as an example, if Plaintiff were to succeed in requiring the City of Trinidad to further remedy its sidewalks and curb cuts, other individuals who use wheelchairs would likewise reap the rewards. So if we were not to apply the repeated violations doctrine to Plaintiff's claims and therefore forever bar those claims on statute of limitations grounds, "a substantively similar but timely suit brought by a different plaintiff"—namely, another qualified individual unable to utilize the City's sidewalks and curb cuts—"could land in [this Court's] lap soon thereafter." Id. Thus, although the clear and unambiguous language of these two statutes carries the day, we note the inherent good sense in "entertaining the claim[s] at hand" but limiting Title II and section 504 plaintiffs "to only those damages suffered within the limitations period and, perhaps more important, to injunctive relief." Id.

at 1136–37. So long as the service, program, or activity remains non-compliant, "and so long as a plaintiff is aware of [that] and remains deterred," the qualified individual's injury repeats. Id. at 1137. A defendant, therefore, cannot brandish the statute of limitations in its usual manner as a shield that fully protects he, she, or it from suit. But the defendant can wield the statute of limitations as a sword that chops off damages arising before the limitations period comes into play.

B.

The City of Trinidad and the Colorado Municipal League ("the League") as *amicus curiae* both claim that our ruling today will effectively "nullify the statute of limitations." Def.'s Resp. Br. 24.

Not so for several reasons. For starters, both the City and the League conflate the repeated violations doctrine and continuing violation doctrine—or at least conflate which of the two Plaintiff is arguing for on appeal—which likely has contributed to that belief. See supra. But setting that point aside, we "will look beyond the plain language of a statute *only* if the result is an absurd application of the law." Brown, 529 F.3d at 1265 (emphasis in original). Observing that the repeated violations doctrine applies to Title II and section 504 claims, however, does not result in any absurd statute-of-limitations outcomes. Indeed, the statute of limitations still has an important role to play even when the repeated violations doctrine applies to a claim. Namely, although the statute of limitations does not bar an untimely lawsuit in its entirety in such an instance, it nonetheless limits the plaintiff's ability to recover damages to only those injuries incurred during the limitations period

24

immediately preceding suit (the plaintiff, of course, can also recover damages for any injuries incurred after filing suit).[13] White, 129 F.3d at 1430. By contrast, the repeated violations doctrine prevents a plaintiff from recovering damages for every injury she suffered throughout history that relates to the non-compliant service, program, or activity.[14] Cf., e.g., Foster, 208 F. App'x at 178. If Plaintiff, for example, had first discovered the City's non-compliant sidewalks and curb cuts in 1996 but still brought suit in 2016, he would not be able to recover damages for every injury he sustained throughout those twenty years; he would be restricted to those injuries he suffered after October 12, 2014. This in itself substantially limits a public entity's liability under Title II and section 504.

---

[13] Theoretically, the statute of limitations *could* still function as a complete bar to an untimely lawsuit even when the repeated violations doctrine applies. Suppose, for instance, a plaintiff was first deterred from utilizing a service, program, or activity in 2009 and tries to bring a lawsuit in 2019 for violations of Title II and section 504 against the public entity responsible. But also suppose the plaintiff concedes that in 2016 the public entity completely and entirely remedied the non-compliant service, program, or activity. Assuming a two-year statute of limitations applies, it would entirely bar the plaintiff's claims even though the repeated violations doctrine also applies to his claims. Indeed, the public entity's *last* possible repeated violation (and the plaintiff's *last* possible injury) would have occurred in 2016 before the remedy went into place, which means that the statute of limitations would have run at some point in 2018. Accordingly, the 2019 lawsuit would be untimely because the plaintiff could not point to a violation or injury that occurred in the two years prior to the day he files suit.

We mention this scenario only to illustrate that it is possible. Our immediate concern, however, is with cases where the public entity has not remedied the non-compliant service, program, or activity. In such instances, the public entity *is* still committing violations, and the qualified individual with a disability *is* still suffering injuries.

[14] The continuing violation doctrine *would* allow for such a recovery. See Morgan, 536 U.S. at 105.

What's more, Title II and section 504 plaintiffs are able to recover damages only in the unusual case. Our circuit requires proof of intentional discrimination before a plaintiff can recover compensatory damages under section 504, Havens v. Colo. Dep't of Corr., 897 F.3d 1250, 1263 (10th Cir. 2018), and we have suggested that as much is required under Title II, Moseley v. Bd. of Educ. of Albuquerque Pub. Sch., 483 F.3d 689, 693 (10th Cir. 2007) (noting that Tenth Circuit precedent suggests, but does not explicitly hold, "that proof of intentional discrimination is required for compensatory damages under Title II"); see also Miraglia v. Bd. of Supervisors of La. State Museum, 901 F.3d 565, 574 (5th Cir. 2018) ("To recover compensatory damages for disability discrimination under Title II of the ADA, a plaintiff *must* also show that the discrimination was intentional." (emphasis added) (internal quotation marks omitted)). And punitive damages are categorically unavailable for suits under Title II and section 504. Barnes v. Gorman, 536 U.S. 181, 189 (2002). So Title II and section 504 plaintiffs are hard-pressed to receive any monetary damages unless they can prove that a service, program, or activity is intentionally discriminatory toward individuals with disabilities, which is surely the exception rather than the rule. This stands as an additional limitation of a public entity's liability under Title II and section 504.

We agree with the City and the League, though, that the repeated violations doctrine will manifest itself by keeping public entities on the hook for injunctive relief as the years go by. After all, if a court grants an injunction requiring a public entity to remedy a program, service, or activity, we have a difficult time seeing just

26

how the court or public entity could divvy that injunction up in a way that limits it to injuries the plaintiff incurred within the limitations period.  See Holmberg v. Ambrecht, 327 U.S. 392, 396 (1946) (observing that equitable relief "eschews mechanical rules").

But the availability of injunctive relief itself does not raise any red flags.  As we described above, when Congress outlined its purposes and goals in enacting the ADA and RA, it expressly noted that it sought full participation, inclusion, and integration in society for individuals with disabilities.  By remaining on the hook for injunctive relief—as its affirmative obligation to accommodate requires—a public entity is incentivized to remedy non-compliant services, programs, or activities in a reasonable yet efficient manner to ensure that full participation.  And along those same lines, Plaintiff makes an excellent point: "public entities . . . have the ultimate option to avoid liability" by "simply mak[ing] their programs, services, and activities accessible for persons with disabilities."  Pl.'s Opening Br. 30; see also Frame v. City of Arlington, 657 F.3d 215, 239 (5th Cir. 2011) (en banc) ("The City may avoid liability whenever it chooses simply by building sidewalks right the first time, or by fixing its original unlawful construction.  In other words, the City is not liable forever; it is responsible only for correcting its own mistakes.").

Further, as far as injunctive relief is concerned, we note that a qualified individual with a disability no longer suffers an injury once he stops "assert[ing] an intent to return to the particular place (or places) where the violations are alleged to be occurring."  Scherr, 703 F.3d at 1074, 1076; see also Frame, 657 F.3d at 238 ("[A]

27

disabled individual has no standing to challenge an inaccessible sidewalk until he can show actual, concrete plans to use that sidewalk." (internal quotation marks omitted)); Barney v. Pulsipher, 143 F.3d 1299, 1306 n.3 (10th Cir. 1998) ("A 'plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured in the future.'" (quoting Facio v. Jones, 929 F.2d 541, 544 (10th Cir. 1991))). Although this implicates Article III standing, Scherr, 703 F.3d at 1073–76, the practical effect of that lack of intent would insulate a public entity from a Title II or section 504 lawsuit seeking prospective injunctive relief. To use an extreme example, if Plaintiff were to move away from the City of Trinidad and had no intent to return, he would no longer be suffering any injury—and, consequently, would lack standing to bring a suit for prospective injunctive relief—regardless of whether the City remedied the sidewalks and curb cuts that allegedly injured him in the past. And even if a qualified individual still suffers an injury after many years, we note that at some point the doctrine of laches may come into play. See SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC, 137 S. Ct. 954, 960 (2017) ("Laches is 'a defense developed by courts of equity' to protect defendants against 'unreasonable, prejudicial delay in commencing suit.'" (quoting Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 667, 678 (2014)). This further cuts against the City's and the League's arguments that public entities will be exposed to unlimited liability.

As a final note, we are not unsympathetic to the City's and the League's arguments that public entities are constrained by limited budgets that do not easily

28

lend themselves to the constant ability to remedy ADA and RA issues.[15]  But again, liability for monetary damages is infrequent, which significantly softens the impact of our ruling today.  See supra.  And if a public entity truly is not liable, or if that entity has already taken significant steps to remedy or can establish that it has multi-year plans in place to remedy a non-compliant service, program, or activity—as the City has apparently done in this case—a factfinder will be able to ferret that out when deciding the merits of any given case.  See, e.g., Rife v. Okla. Dep't of Pub. Safety, 854 F.3d 637, 643 (10th Cir. 2017) (observing that factfinders find facts weighing on liability).  Indeed, at least two other circuits have endorsed either the repeated violations doctrine or continuing violation doctrine in the context of ADA Title III claims, but neither the City nor the League have directed us to any evidence suggesting that places of public accommodation located in those circuits have faced significant hardship by the courts' respective applications of the doctrines.  See Pickern, 293 F.3d at 1136–37; Scherr, 703 F.3d at 1075–76.

Thus, the City's and the League's concerns are unsubstantiated.

IV.

The district court did not recognize the impact of the repeated violations doctrine on Plaintiff's claims under Title II of the ADA and section 504 of the RA.

---

[15] The City contends that adopting the repeated violations doctrine will cause this inability to remedy ADA and RA issues, but it is mistaken.  Even without the repeated violations doctrine, qualified individuals with disabilities who have encountered the City's non-compliant services, programs, or activities within the past two years could just as easily bring lawsuits against the City.  So the danger about which the City complains exists even under their own interpretation of the law.

Instead, it concluded that Plaintiff could not "rely solely on the continued inaccessibility of the City's sidewalks and curb cuts" to survive dismissal under Colorado's two-year statute of limitations.

This was error. Because the district court applied an incorrect standard, it could not determine under the proper framework how the two-year statute of limitations affected Plaintiff's claims. As a court of review, we will not decide that inquiry for the first time on appeal. Pignanelli v. Pueblo Sch. Dist. No. 60, 540 F.3d 1213, 1218 (10th Cir. 2008). We thus remand the case to the district court to decide in the first instance under the framework set forth in this opinion which of Plaintiff's injuries he may seek relief for and which of those he may not. In so doing, the district court will necessarily need to determine which of the City's sidewalks and curb cuts Plaintiff has actually been deterred from utilizing.[16]

For the reasons set forth above, we REVERSE and REMAND for further proceedings consistent with this opinion.

---

[16] In issuing these instructions on remand, we emphasize once again that we take no stance on the question whether sidewalks and curb cuts qualify as a service, program, or activity of a public entity. We also issue these instructions cognizant of the fact that the district court *assumed*—much like we did—that sidewalks and curb cuts qualify as a service, program, or activity of a public entity so that it could reach the "narrower" and "dispositive" statute of limitations question. For those reasons, the district court may now find it necessary to definitively decide on remand whether sidewalks and curb cuts qualify as a service, program, or activity of a public entity, and it should not read anything in this opinion as preventing it from doing so.