**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 20, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

WYO-BEN INC., a Montana corporation,

    Petitioner - Appellant,

v.

DEBRA HAALAND, an individual, in her capacity as Secretary of the United States Department of the Interior; TRACY STONE-MANNING,* an individual, in her capacity as Acting Director of the United States Bureau of Land Management,

    Respondents - Appellees.

No. 20-8065

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:19-CV-00215-ABJ)**
_____

Robert R. Marsh, S&D Law, Denver, Colorado (William R. Marsh, Sedalia, Colorado, with him on the briefs), for Petitioner-Appellant.

John Emad Arbab, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C. (Jean E. Williams, Acting Assistant Attorney General and Erika B. Kranz, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C.;  L. Robert Murray, United States Attorney and Nicholas Vassallo, Assistant United States Attorney, Cheyenne, Wyoming; Kendra Nitta, of Counsel, Office of the Solicitor, U.S. Department of the Interior, Washington, D.C.; with him on the brief), for Respondents-Appellees.

---

    *    Pursuant to Fed. R. App. P. 43(c)(2), Tracy Stone-Manning, the current director of the United States Bureau of Land Management, is substituted for William Perry Pendley.

_____

Before **HOLMES**, Chief Judge, **McHUGH**, and **CARSON**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

_____

Plaintiff-Appellant Wyo-Ben, Inc., ("Wyo-Ben") appeals from the district court's dismissal of its complaint against the Secretary of the Department of the Interior (the "Secretary") and the Bureau of Land Management ("BLM," and collectively with the Secretary, the "Respondents") asserting a single claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1).[1]

In 1993, Wyo-Ben filed a mineral patent application with BLM. While that application was pending, on September 30, 1994, Congress enacted a moratorium on processing mineral patent applications. *See* Department of the Interior and Related Agencies Appropriations Act, 1995, Pub. L. No. 103-332, tit. I, § 112, 108 Stat.

---

[1]    Section 706(1) provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
>
> (1) compel agency action unlawfully withheld or unreasonably delayed . . . .

5 U.S.C. § 706(1).

2499, 2519 (Sept. 30, 1994) ("1995 Act").[2]  In the same legislation, Congress also enacted an exemption to the moratorium.  *See id.* § 113.  Under the exemption, if a patent application was still pending by September 30, 1994, and it otherwise complied with certain conditions, the patent application was not subject to the moratorium and the Secretary was required to process the application.  On October 3, 1994, BLM—but not the Secretary—determined that Wyo-Ben's mineral patent application did not qualify for the exemption.  Congress thereafter reenacted the 1995 Act—including the moratorium and exemption—annually through 2019.  *See, e.g.*, Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. E, tit. IV, §§ 404(a), 404(b), 133 Stat. 13, 258 (Feb. 15, 2019) ("2019 Act").[3]

In 2019, Wyo-Ben brought the instant action against Respondents, alleging that, pursuant to § 706(1) of the APA, the Secretary "unlawfully withheld" and "unreasonably delayed" agency action by failing to review Wyo-Ben's pending application to determine whether it is exempt from the moratorium.  Respondents submitted a motion for "bifurcated proceeding on timeliness defense," arguing that

---

[2]     We refer to each appropriations act by reference to the calendar year in which the act expires, even though Congress may have enacted the particular appropriations act during the previous calendar year.  For example, although Congress enacted the Department of the Interior and Related Agencies Appropriations Act, 1995, in September 1994, we refer to this appropriations act as the "1995 Act" because the act provides appropriations "for the fiscal year ending September 30, 1995."  1995 Act, 108 Stat. at 2499.  We apply the same approach in referring to each of the other appropriations acts cited herein.

[3]     The moratorium and exemption were contained in §§ 112 and 113 of the 1995 Act.  The same provisions appear in §§ 404(a) and 404(b) of the 2019 Act.

Wyo-Ben's complaint was time-barred.  Applying the legal standard governing the resolution of motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court agreed.  The court found that Wyo-Ben's claim was statutorily barred by 28 U.S.C. § 2401(a), which is the statute of limitations applicable to claims against the United States.[4]  The court reasoned that Wyo-Ben's § 706(1) claim first accrued on the date BLM determined that Wyo-Ben's patent application is not exempt (i.e., October 3, 1994) and that the limitations period expired six years later (i.e., October 3, 2000).

In holding that Wyo-Ben's claim was untimely, the district court declined to apply two doctrines—the continuing violation doctrine and the repeated violations doctrine—either of which would bring Wyo-Ben's claim within the six-year limitations period.  The continuing violation doctrine "tethers conduct from both inside and outside the limitations period into *one single violation* that, taken as a whole, satisfies the applicable statute of limitations."  *Hamer v. City of Trinidad*, 924 F.3d 1093, 1100 (10th Cir. 2019) (emphasis added).  For purposes of the continuing violation doctrine, a claim asserts a "single violation" that "continues over an extended period of time 'when the . . . claim seeks redress for injuries resulting from

---

[4]    Section 2401(a) provides, in relevant part, "[e]xcept as provided by chapter 71 of title 41, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  28 U.S.C § 2401(a).

a series of separate acts that collectively *constitute one unlawful act*.'" *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 672 (10th Cir. 2016) (emphasis added) (quoting *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009)).

By contrast, "the repeated violations doctrine 'divides what might otherwise represent a single, time-barred cause of action into several separate claims, at least one of which accrues within the limitations period prior to suit.'" *Hamer*, 924 F.3d at 1100 (quoting Kyle Graham, *The Continuing Violations Doctrine*, 43 GONZ. L. REV. 271, 275 (2008)). Because the district court concluded that the only allegedly unlawful conduct occurred when BLM found in 1994 that the moratorium applied to Wyo-Ben's application, the district court held that neither doctrine applied.

On appeal, Wyo-Ben avers that the district court misconstrued its § 706(1) claim by characterizing the allegedly unlawful conduct as BLM's decision that Wyo-Ben's application falls within the moratorium. According to Wyo-Ben, it is not challenging *BLM's agency action*, but rather the *Secretary's in*action as to its patent application, which is allegedly unlawful in light of the 1995 Act and subsequent statutory iterations of like effect, including the 2019 Act. Because the Secretary allegedly failed to review Wyo-Ben's application each year from 1995 through 2019, Wyo-Ben argues that the continuing violation and repeated violations doctrines apply to its § 706(1) claim, asserted in 2019. And, assuming its claim is timely, Wyo-Ben petitions us to rule on the merits and compel the Secretary to review Wyo-Ben's pending application in accordance with the 2019 Act.

5

Exercising jurisdiction under 28 U.S.C. § 1291, we **reverse** the district court's judgment and **remand** the action for further proceedings consistent with this opinion.

## I

### A

Because the district court's order granted Respondents' motion to dismiss pursuant to Rule 12(b)(6), we rely primarily on the "allegations from the [c]omplaint[, taken] as true." *Herrera v. City of Espanola*, 32 F.4th 980, 986 (10th Cir. 2022) (addressing a 12(b)(6) motion to dismiss a claim on timeliness grounds and—in addition to placing primary reliance on the complaint's allegations—considering materials in the administrative record of which the district court properly took judicial notice); *see also* 5B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed.), Westlaw (database updated Apr. 2022) (explaining that while courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts may additionally consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned[,] . . . without converting the motion into one for summary judgment").

On March 30, 1993, Wyo-Ben filed with the BLM Wyoming State Office an application for a mineral patent to some 290 placer mining claims consisting of approximately 7,070 acres in Big Horn County, Wyoming. A "placer" claim encompasses "all forms of [mineral] deposit" except for "veins of quartz[] or other

rock" that is "in place." 30 U.S.C. § 35. From April through August 1993, Wyo-Ben submitted various documents relevant to its application.

On August 31, 1993, BLM received additional documents from Wyo-Ben, including a check to pay the purchase price of the land contained in the patent application. BLM deemed the check prematurely submitted and returned it to Wyo-Ben.

On March 14, 1994, Wyo-Ben again resubmitted the documents, but this time without the purchase-price check. In doing so, Wyo-Ben did not dispute BLM's August 31, 1993, decision finding that Wyo-Ben tendered the purchase price prematurely. Four days later, on March 18, 1994, BLM sent a decision letter responding to Wyo-Ben's March 14 letter, again finding that the documents Wyo-Ben submitted were premature.

On September 30, 1994, the statutory moratorium on processing mineral patent applications went into effect.[5] The statute provided an exemption from the moratorium for applications that, based on the Secretary's assessment, fit certain

---

[5]     The provision establishing the moratorium states in relevant part:

> [N]one of the funds appropriated or otherwise made available pursuant to this Act shall be obligated or expended to accept or process applications for a patent for any mining . . . claim located under the general mining laws or to issue a patent for any mining . . . claim located under the general mining laws.

Pub. L. No. 103-332, tit. I, § 112, 108 Stat. at 2519.

criteria under the 1995 Act.[6]  Pub. L. No. 103-332, tit. I, § 113, 108 Stat. at 2519.

The following week, on October 3, 1994, BLM determined that Wyo-Ben's mineral

patent application, serial number WYW128934, was subject to the moratorium.  A

few weeks thereafter, on October 26, 1994, BLM circulated an official list of all

mineral patent applications that were exempt, and Wyo-Ben's application was not on

the list.  Wyo-Ben's last communication with BLM was the March 14, 1994, letter.

Congress thereafter renewed and reenacted the 1995 Act annually through 2019.

**B**

Twenty-five years later, on October 17, 2019, Wyo-Ben filed the instant action

in the U.S. District Court for the District of Wyoming.  Wyo-Ben alleged that the

"Secretary's failure to apply the criteria required by applicable law to determine

whether the Application qualifies for the Section 404(b) moratorium exception [in the

2019 Act] constitutes agency action unlawfully withheld and unreasonably delayed"

under § 706(1) of the APA.  Aplt.'s App., Vol. I, at 10–11 (Compl., filed Oct. 17,

---

[6]    Section 113 of the 1995 Act, which provides the exemption, states in relevant part:

> The provisions of section 112 shall not apply if the Secretary of the Interior determines that, for the claim concerned: (1) a patent application was filed with the Secretary on or before the date of enactment of this Act, and (2) all requirements established under . . . (30 U.S.C. 29 and 30) for vein or lode claims and . . . (30 U.S.C. 35, 36, and 37) for placer claims, and . . . (30 U.S.C. 42) for mill site claims, as the case may be, were fully complied with by the applicant by that date.

Pub. L. No. 103-332, tit. I, § 113, 108 Stat. at 2519.

2019). Wyo-Ben sought an order requiring "the [Respondents] to review the Application to determine whether it qualifies for the Section 404(b) exception [of the 2019 Act]" within thirty days. *Id.* at 11. On March 30, 2020, Respondents filed a motion for "bifurcated proceeding on timeliness defense." *Id.* at 118–21 (Mot. for Bifurcated Proceeding on Timeliness Defense, filed Mar. 30, 2020). The district court granted that motion and ordered briefing. *See id.* at 138 (Dist. Ct. Order, filed May 5, 2020).

On September 23, 2020, the district court issued an order dismissing Wyo-Ben's complaint as untimely. *See* Aplt.'s Opening Br., Ex. 1 at 1–3 (Dist. Ct. Order, filed Sept. 23, 2020).[7] Before addressing the statute of limitations, the court acknowledged its authority to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* at 18 (quoting 5 U.S.C. § 706(1)). It also noted that a § 706(1) claim can proceed "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* (quoting *Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 64 (2004)). And the court interpreted the relief Wyo-Ben had requested as "a Court order requiring the Secretary to continue processing [Wyo-Ben's] patent application to see if it qualifies for the grandfather clause in the moratorium." *Id.*

---

[7]     Due to difficulties we have experienced in reading the copy of the district court's order that is included in the Appellant's Appendix, *see* Aplt.'s App., Vol. I, at 202 (Dist. Ct. Order, filed Sept. 23, 2020), we cite to the version of the order attached as Exhibit 1 to the Appellant's Opening Brief.

Nevertheless, the district court found that Wyo-Ben's claim was untimely under the six-year statute of limitations that is generally applicable to actions against the United States because the claim purportedly first accrued when BLM determined in 1994 that Wyo-Ben's application did not qualify for the exemption. *See id.* at 19–21 (citing 28 U.S.C. § 2401(a)). According to the district court, Wyo-Ben alleged only "one violation," which BLM—not the Secretary—committed, namely, "BLM improperly making a determination [that] Wyo-Ben's application was subject to the moratorium." *Id.* at 19; *see also id.* at 20 (stating "the only allegedly unlawful act was BLM classifying Wyo-Ben's patent as suspended by the moratorium"). Because there had ostensibly "been no acts amounting to new violations since" 1994, the court found that the statute of limitations expired in 2000. *Id.* at 19; *see also id.* at 19–21.

Critical to this appeal, in finding that Wyo-Ben's claim was time-barred, the district court concluded that neither the continuing violation doctrine nor the repeated violations doctrine applied to Wyo-Ben's claim. *See id.* at 20. With respect to the continuing violation doctrine, the district court explained that "[a] claim for a continuing violation fails if the plaintiff knew, or through the exercise of reasonable diligence, would have known of the injury when it first began." *Id.* (citing *Sierra Club*, 816 F.3d at 674). Because "[n]othing prevented Wyo-Ben from inquiring into the status of its application once in 25 years," the court concluded that the "continuing violation doctrine does not fit." *Id.*

The court similarly rejected Wyo-Ben's reliance on the "repeated violations" doctrine. *Id.* Explaining that the repeated violations doctrine "involves, single,

separate claims, each with their own statute of limitations period," *id.* (citing *Hamer*, 924 F.3d at 1100), the court concluded that the doctrine is inapplicable "because the only alleged unlawful act was BLM classifying Wyo-Ben's patent [application] as suspended by the moratorium," which happened only once, in 1994, *id.* Additionally, the district court presumed that we limited the repeated violations doctrine in *Hamer* to claims asserted under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. *See id.* (citing *Hamer*, 924 F.3d at 1103).

The district court also addressed our decision in *Mt. Emmons Mining Co. v. Babbitt*, 117 F.3d 1167 (10th Cir. 1997). *See id.* at 21–22. In *Mt. Emmons*, the Secretary of the Interior had issued an interpretive memorandum under which the exemption in § 113 of the 1995 Act only granted the Secretary authority to deem exempt applications "for which a [First Half Final Certificate ("FHFC")] was signed before October 1, 1994" or "for which a FHFC was pending in Washington, D.C., as of September 30, 1994." 117 F.3d at 1169.[8] As we explained there, a FHFC issues when an "application is complete in that the applicant has complied with all requirements for *applying for* a patent." *Id.* at 1171.[9] Because the plaintiff's

---

[8]    The Secretary adopted this interpretation in Instruction Memorandum No. 95-01 ("IM 95-01"). *See Mt. Emmons*, 117 F.3d at 1169; *see also* Aplt.'s App., Vol. III, at 23 (IM 95-01, dated Oct. 4, 1994).

[9]    We helpfully elaborated on the nature of a FHFC in a footnote in *Mt. Emmons*: "[T]he FHFC '[c]ertifies that the applicant has satisfactorily complied with all of the 'paperwork' requirements of the Mining Law (title, proofs, posting requirements, purchase money).'" *Mt. Emmons*, 117 F.3d at 1168 n.1 (quoting BLM Manual H–3860–1, ch. VI, pp. VI–1 and –2). Respondents in their briefing before us speak of the FHFC this way: "The issuance of an FHFC is the Interior Department's

application did not satisfy either criterion in the interpretive memorandum, BLM had determined that its application did not qualify for the exemption. *See id.* at 1169. We concluded that the Secretary's interpretive memorandum conflicted with § 113 of the 1995 Act because the exemption "clearly *requires* the Secretary [of the Interior] to determine eligibility of pending applications for FHFC[s]." *Id.* at 1171. Accordingly, we held that the Secretary had "unlawfully withheld" agency action and granted relief pursuant to § 706(1) of the APA—requiring the Secretary "to continue processing Mt. Emmons' patent application to determine whether it is sufficiently complete to qualify for the § 113 exemption." *Id.* at 1168, 1172–73.

Yet the district court rejected Wyo-Ben's reliance on *Mt. Emmons*, finding it distinguishable. *See* Aplt.'s Opening Br., Ex. 1 at 20–22. According to the district court, "[t]he most glaring [distinction is that] Mt. Emmons filed its APA complaint on December 30, 1994," while Wyo-Ben filed its action twenty-five years later. *Id.* at 22 (citing *Mt. Emmons*, 117 F.3d at 1169). Additionally, the district court noted that whereas "BLM requested, received, and accepted Mt. Emmons' payment for its application," here, "BLM rejected Wyo-Ben's tender of payment, and Wyo-Ben accepted . . . that decision." *Id.* (citing *Mt. Emmons*, 117 F.3d at 1168).

---

internal, administrative recording of the application, and acknowledges that the patent applicant has satisfied the 'paperwork' requirements of the Mining Law of 1872." Aplees.' Resp. Br. at 1.

Having found Wyo-Ben's claim untimely, the district court entered final judgment dismissing Wyo-Ben's complaint. Wyo-Ben filed its timely notice of appeal.

## II

We review de novo a district court's ruling that a plaintiff's claim is time-barred. *See, e.g.*, *Hamer*, 924 F.3d at 1099 (citing *Sierra Club*, 816 F.3d at 671). The statute of limitations is an affirmative defense that a defendant must raise, and we typically require factual development before deciding whether a claim is timely. *See Herrera*, 32 F.4th at 991 (citing *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018)). But we may resolve "[a] statute of limitations defense . . . 'on a [Rule] 12(b) motion when the dates given in the complaint make clear that the right sued upon has been extinguished.'" *Sierra Club,* 816 F.3d at 671 (second alteration in original) (quoting *Lee v. Rocky Mountain UFCW Unions & Emp'rs Tr. Pension Plan,* 13 F.3d 405, at *1 (10th Cir. 1993) (non-precedential order and judgment)); *see also Herrera*, 32 F.4th at 1001 (reversing a district court order that granted a Rule 12(b)(6) motion to dismiss the plaintiffs' claims as untimely).

## III

Wyo-Ben asserts a single claim in this litigation: it alleges that the Secretary "unlawfully withheld and unreasonably delayed" action required under the relevant appropriations acts—most recently under the Act applicable in fiscal year 2019—by failing to review Wyo-Ben's application, entitling Wyo-Ben to relief under § 706(1). Aplt.'s App., Vol. I, at 10–11. The district court held that Wyo-Ben's claim is time-

barred under 28 U.S.C. § 2401(a), which adopts a six-year statute of limitations for "every civil action commenced against the United States." 28 U.S.C. § 2401(a); *see* Aplt.'s Opening Br., Ex. 1 at 19, 21. On appeal, Wyo-Ben argues that the district court erred by misconstruing its claim as a challenge to BLM's October 3, 1994, determination that Wyo-Ben's pending application did not qualify for a statutory exemption. *See* Aplt.'s Opening Br. at 20–22. Wyo-Ben argues that its complaint instead challenges the Secretary's *in*action in failing to review Wyo-Ben's patent application to determine whether it qualifies for the exemption, as required under the relevant appropriations acts. *See id.* Construed properly, Wyo-Ben argues that its claim is timely under either the continuing violation doctrine or the repeated violations doctrine. We agree with Wyo-Ben that the district court misconstrued its claim and that its claim is timely under the repeated violations doctrine.[10]

---

[10] Wyo-Ben also posits that the district court erred when it took judicial notice of BLM's 1994 determination. We do not agree. It is well-established that district courts may take judicial notice of, and consider, documents in the administrative record on a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." (citing 5B Wright & Miller, *supra*, § 1357)); *see also Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1213 (10th Cir. 2012) ("The contents of an administrative agency's publicly available files, after all, traditionally qualify for judicial notice, even when the truthfulness of the documents on file is another matter."); *Hodgson v. Farmington City*, 675 F. App'x 838, 840–841 (10th Cir. 2017) (unpublished) ("[T]he district court [did not] err[] in taking judicial notice of public records from the parties' administrative and judicial proceedings without converting [the defendant]'s motion to dismiss into a motion for summary judgment" because "[t]he records at issue . . . document[ed] the review and authorization of [the defendant]'s actions and thus [had] 'a direct relation' to [the] case." (appearing to

14

**A**

We first explain how the district court misconstrued Wyo-Ben's complaint. Wyo-Ben argues that it challenged the Secretary's inaction as to its application for "'failure to apply the criteria required by applicable law to determine whether the Application qualifies for the Section 404(b) moratorium exception' in the 2019 Act." Aplt.'s Opening Br. at 39–40 (quoting Aplt.'s App., Vol. I, at 10). But the district court construed Wyo-Ben's complaint as challenging an alleged "violation" by BLM—that is, "BLM improperly making a determination [in 1994 that] Wyo-Ben's application was subject to the moratorium." *Id.*, Ex. 1 at 19. In substance, we agree with Wyo-Ben's contention that the district court mischaracterized Wyo-Ben's complaint.

Wyo-Ben brought a claim under § 706(1) of the APA, which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." *SUWA*, 542 U.S. at 62 (quoting 5 U.S.C. § 706(1)). It is clear from the complaint that Wyo-Ben's theory concerns the Secretary's *in*action, not BLM's *action* in the form of the 1994 determination. According to Wyo-Ben, it has a pending patent application that, contrary to statutory mandates, the Secretary *never* reviewed to determine whether the application is exempt from the moratorium—inaction by the Secretary that, under Wyo-Ben's theory, effectively violated the law each time Congress renewed the 1995

---

quote from *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979))).

Act.  *See* Aplt.'s App., Vol. I, at 8–11.  To remedy that injury, Wyo-Ben requested

that the district court compel the Secretary to review its pending application in

accordance with the 2019 Act.  *See id.* at 11.

However, following Respondents' lead, the district court determined that

BLM's October 3, 1994, determination was material to—and, indeed, dispositive

of—this case.  Notably, instead of finding that BLM's 1994 determination was, as a

matter of law, the Secretary's decision—in other words, concluding that BLM

exercised delegated authority from the Secretary when it decided that the application

did not meet the exemption's requirements—the district court characterized BLM's

decision as the "violation" that Wyo-Ben challenges and on which the limitations

period first accrued.  *See* Aplt.'s Opening Br., Ex. 1 at 19.[11]

There is a critical difference between a claim that the Secretary unlawfully

withheld or unreasonably delayed in taking an action—specifically, reviewing Wyo-

Ben's application—and a claim that BLM incorrectly determined that the application

was subject to the moratorium.  The latter circumstance is what both Respondents

and the district court improperly ascribe to Wyo-Ben's complaint.  In other words,

the district court and Respondents have operated on the premise that Wyo-Ben is

---

[11]     It is certainly possible that BLM properly resolved Wyo-Ben's
application in 1994 pursuant to authority the Secretary delegated lawfully, as
Respondents claim in their briefing on appeal.  *See* Aplees.' Resp. Br. at 28 n.11, 46.
But that is not what the district court held.  It held that because BLM in its own right
determined in 1994 that the application did not qualify for the exemption, Wyo-Ben
needed to bring its § 706(1) claim within six years of that determination.  But, again,
that is a misconstruction of what Wyo-Ben alleges in this action.

challenging BLM's determination that its application was not subject to the § 113 exemption. But it is clear to us that Wyo-Ben claims *the Secretary* never decided whether its application is exempt. And because the Secretary never made that determination, Wyo-Ben filed a § 706(1) lawsuit to compel the Secretary to act. Thus, we conclude Wyo-Ben is correct that the district court misconstrued its § 706(1) claim.

**B**

Having concluded that the district court misconstrued Wyo-Ben's claim, we next address whether its claim—construed properly—was timely. The district court and Respondents maintain that Wyo-Ben's claim first accrued in 1994 and is untimely under the statute of limitations provided in 28 U.S.C. § 2401(a), which purportedly expired in 2000. Respondents alternatively suggest that Wyo-Ben's claim accrued at the latest by 1997, when we decided *Mt. Emmons*, which gave Wyo-Ben notice of its potential claim against the Secretary under § 706(1). Wyo-Ben argues that its claim is timely under the continuing violation doctrine and the repeated violations doctrine.

At the outset, we acknowledge that there is a more-than-colorable question concerning whether § 2401(a) applies at all in these circumstances. We have applied § 2401(a) to claims challenging arbitrary and capricious agency *action* under § 706(2) of the APA. *See, e.g.*, *Nagahi v. Immigr. & Naturalization Serv.*, 219 F.3d 1166, 1171 (10th Cir. 2000) ("In the absence of a specific statutory limitations period, a civil action against the United States under the APA is subject to the six[-

17

]year limitations period found in 28 U.S.C. § 2401(a)." (citing *Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494–95 (10th Cir. 1997))).  But we have never explicitly applied the six-year statute of limitations of § 2401(a) to claims challenging agency *in*action under § 706(1).

Moreover, the D.C. Circuit has "repeatedly refused to hold that actions seeking relief under 5 U.S.C. § 706(1) to 'compel agency action unlawfully withheld or unreasonably delayed' are time-barred if initiated more than six years after an agency fails to meet a statutory deadline."  *The Wilderness Soc'y v. Norton*, 434 F.3d 584, 588 (D.C. Cir. 2006); *see also id.* at 588–89 (first citing *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549–50 (D.C. Cir. 1999); and then citing *In re Bluewater Network*, 234 F.3d 1305, 1314–16 (D.C. Cir. 2000)).  Although *Wilderness Society* relied on an alternative ground in resolving the case before it, and therefore had no "need" to make a "final determination" on whether the plaintiff's suit was properly dismissed as time-barred, the panel did shed light on the rationale underlying the D.C. Circuit's position.  *Id.* at 588.  Specifically, *Wilderness Society* analyzed an earlier D.C. Circuit decision—*United Mine Workers*—that had rebuffed an analogous timeliness challenge to a litigant's effort to secure § 706(1) relief through a writ of mandamus, by reasoning that "[the claim] 'does not complain about what the agency has done but rather about what the agency has yet to do.'" *Wilderness Soc'y*, 434 F.3d at 589 (quoting *United Mine Workers*, 190 F.3d at 549); *see also Am. Canoe Ass'n, Inc. v. Env't Prot. Agency*, 30 F. Supp. 2d 908, 925 (E.D. Va. 1998) (holding that plaintiff's § 706(1) claim was not time-barred because

18

"application of a statute of limitations to a claim of unreasonable delay is grossly inappropriate, in that it would mean that EPA could immunize its allegedly unreasonable delay from judicial review simply by extending that delay for six years," and opining that "EPA's delay is better understood as a continuing violation, which plaintiffs may challenge at any time provided the delay continues" (citing *Nat. Res. Def. Council v. Fox*, 909 F. Supp. 153, 159 (S.D.N.Y. 1995))).[12]

However, under the circumstances here, we need not opine on whether § 2401(a)'s limitations period applies to a § 706(1) case.  That is because the parties have litigated this case on the ground that § 2401(a)'s limitations period is applicable and controlling—not to mention the fact that the district court followed suit and rested its holding on § 2401(a).  Given what amounts to an effective agreement of the parties regarding the applicability of § 2401(a)'s limitations period, we are content to assume without deciding that this limitations period does apply and proceed with our analysis of whether Wyo-Ben's claim is time-barred.  Stated otherwise, the parties' litigation posture regarding the applicability of § 2401(a)'s limitations period to

---

[12]    At least arguably, the Ninth Circuit also has signaled its endorsement of this approach, which would render § 2401(a)'s limitations provision inapplicable in actions under § 706(1) of the APA. *Compare Hells Canyon Preservation Council v. United States Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010) (as to a § 706(1) claim, concluding that "the timeliness of [the] plaintiffs' claim [wa]s beside the point," and holding instead that the plaintiffs failed to state a claim because they did "not identif[y] an 'ongoing failure to act'"), *with Pit River Tribe v. Bureau of Land Mgmt.*, 512 F. Supp. 3d 1055, 1064–65 (E.D. Cal. 2021) (citing *Hells Canyon*, and noting that "[t]he Ninth Circuit has suggested, without specifically addressing the issue, that § 2401(a) may not be applicable in [§] 706(1) failure to act claims under the APA").

Wyo-Ben's claim provides the conceptual baseline from which our analysis proceeds, and we turn to the inquiry concerning whether Wyo-Ben's claim is timely under either the continuing violation doctrine or the repeated violations doctrine. Although we conclude that Wyo-Ben has waived its argument concerning the continuing violation doctrine, we hold that Wyo-Ben's claim is timely under the repeated violations doctrine.

**1**

In its appellate briefing, Wyo-Ben expressly relies in part on the continuing violation doctrine. *See, e.g.*, Aplt.'s Opening Br. at 3 (stating that the appellate issue, in part, is "[w]hether the district court erred by not applying the continuing violation doctrine"); *id.* at 17 (noting that "[t]his case fits well within both doctrines [i.e., the continuing violation and the repeated violations doctrines] and, when either of them is applied in this case, the result is that the statute of limitations in 28 U.S.C. § 2401(a) does not bar the filing of the Complaint"). The continuing violation doctrine applies "'when the plaintiff's claim seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act,' as opposed to 'conduct that is a discrete unlawful act.'" *Sierra Club*, 816 F.3d at 672 (quoting *Shomo*, 579 F.3d at 181). "[O]ne violation continues when 'the conduct as a whole can be considered as a single course of conduct.'" *Id.* (quoting *Birkelbach v. Sec. & Exch. Comm'n*, 751 F.3d 472, 479 n.7 (7th Cir. 2014)). "The utility of the continuing violation doctrine lies in the fact that as long as one of the separate wrongful acts contributing to the collective conduct 'occurs within the filing period,' a court may

consider 'the *entire* time period'—including those separate acts falling outside the filing period—'for the purposes of determining liability.'" *Hamer*, 924 F.3d at 1098–99 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

For two salient reasons, however, we deem Wyo-Ben's arguments regarding the continuing violation doctrine to be waived. First, Wyo-Ben conceded before the district court that the doctrine did not apply to its action against Respondents. In opposing Respondents' motion to dismiss, Wyo-Ben discussed the differences between the continuing violation and repeated violations doctrines at length. *See* Aplt.'s App., Vol. I, at 176–77 (Pet'r's Br. Opposing and Requesting Oral Argument on Respondents' Mot. to Dismiss Based on Timeliness Defense, filed June 19, 2020). Critically, after that discussion, Wyo-Ben explained that, "unlike the continuous ongoing violation found to exist in *Sierra Club* . . ., Wyo-Ben's claim does not involve a prolonged violation of a *single* permanent statute. It involves the terms of the 1994 appropriations act that lost any force or effect when that statute expired, but were thereafter *repeated* in multiple entirely new statutes, each imposing a specific affirmative obligation to act." *Id.* at 178 (second emphasis added). Wyo-Ben also stated that "the unlawful act asserted here . . . does not come within the definition of one continuing violation of a single permanent statute. Conversely, it fits perfectly and literally within the definition of a violation both 'repeated' and 'discrete.'" *Id.* at 179. Accordingly, Wyo-Ben submitted that it is "clear . . . this case involves a repeated, discrete unlawful act by Respondents *as opposed to a single continuing unlawful act* by them." *Id.* at 180 (emphasis added).

21

Based on the foregoing, we would be hard pressed to identify a clearer case of waiver. Specifically, it is well-established that we do not consider arguments an appellant intentionally disclaimed or abandoned before the district court. *See, e.g.*, *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127 (10th Cir. 2011) ("If the theory was intentionally relinquished or abandoned in the district court, we usually deem it waived and refuse to consider it."); *cf. United States v. Carrasco-Salazar*, 494 F.3d 1270, 1272 (10th Cir. 2007) ("[W]aiver is accomplished by *intent*, [but] forfeiture comes about through *neglect*." (second alteration in original) (emphases added) (quoting *United States v. Staples*, 202 F.3d 992, 995 (7th Cir. 2000))). Based on its statements in the district court, Wyo-Ben has waived any appellate argument it may have in support of the continuing violation doctrine. It intentionally conceded in the district court that the continuing violation doctrine does not apply.

Second, even if we were inclined to put aside this clear evidence of waiver based on Wyo-Ben's concessions before the district court, we would conclude that, at the very least, Wyo-Ben forfeited any argument in that court based on the continuing violation doctrine and because it has not advanced a continuing violation argument under the plain-error rubric before us, it has effectively waived any such argument. Specifically, in its briefing before the district court, Wyo-Ben failed to include any section identified as one explaining why its complaint is subject to the continuing violation doctrine.

Further, unlike its litigation position on appeal, Wyo-Ben did not explicitly argue that *both* the repeated violations and continuing violation doctrines apply.

22

Judging from its exclusive reliance on the former, at the very least, Wyo-Ben forfeited its right to invoke the continuing violation doctrine, and its failure to argue under the plain-error framework before us transforms the initial forfeiture into an effective waiver. *See, e.g.*, *In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1271 (10th Cir. 2019) ("If an appellant does not explain how its forfeited arguments survive the plain error standard, it effectively waives those arguments on appeal."); *Havens v. Colo. Dep't of Corrs.*, 897 F.3d 1250, 1259 (10th Cir. 2018) ("We conclude that [the plaintiff] has forfeited the argument that Title II validly abrogates sovereign immunity as to his claim by failing to raise this argument before the district court, and he has effectively waived the argument on appeal by not arguing under the rubric of plain error."); *see also Richison*, 634 F.3d at 1131 ("[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court.").

For these reasons, we find Wyo-Ben's reliance on the continuing violation doctrine waived and decline to consider it.[13]

**2**

We turn next to the repeated violations doctrine. "[T]he repeated violations doctrine '*divides* what might otherwise represent a single, time-barred cause of action

---

[13]    We recently held that the continuing violation doctrine is available as to actions involving claims brought under 42 U.S.C. § 1983. *See Herrera*, 32 F.4th at 994. But because we find that Wyo-Ben waived its right to rely on the continuing violation doctrine, we do not address whether the continuing violation doctrine also applies to claims under § 706(1) of the APA.

into several separate claims, at least one of which accrues within the limitations period prior to suit.'" *Hamer*, 924 F.3d at 1100 (quoting Graham, *supra*, at 275). "That division, in turn, 'allows recovery for only that part of the injury the plaintiff suffered during the limitations period'; recovery for the part of the injury suffered outside of the limitations period, however, remains unavailable." *Id.* (first quoting *White v. Mercury Marine, Div. of Brunswick, Inc.*, 129 F.3d 1428, 1430 (11th Cir. 1997); and then citing *Figueroa v. D.C. Metro. Police Dep't*, 633 F.3d 1129, 1135 (D.C. Cir. 2011)).

*Hamer* illustrates the repeated violations doctrine in action. The plaintiff, who was confined to a motorized wheelchair and primarily used public sidewalks to move about, sued the City of Trinidad alleging that the city's sidewalks were not compliant with Title II of the ADA or Section 504 of the Rehabilitation Act. *See id.* at 1097–98. In ruling on the city's motion for summary judgment, the district court applied Colorado's general two-year statute of limitations and concluded that the plaintiff's claims were untimely because the plaintiff first discovered or encountered the city's noncompliant sidewalks more than two years before he filed his complaint. *See id.* at 1098.

On appeal, we held that the plaintiff's claims were timely under the repeated violations doctrine. Two questions guided our analysis: (1) "Does a public entity violate Title II and section 504 only when it initially constructs or creates a non-compliant service, program, or activity?" (2) "Or does a public entity violate Title II and section 504 *repeatedly* until it affirmatively acts to remedy the non-compliant

24

service, program, or activity?" *Id.* at 1097. We answered "no" to the first question and "yes" to the second. *See id.* As we explained, "a public entity repeatedly violates those two statutes each day that it fails to remedy a non-compliant service, program, or activity." *Id.* at 1103.

Our analysis began with the plain language of the statutes under which the plaintiff brought suit. Phrased in the present tense, both statutes suggest that a qualified individual who *currently* experiences discrimination suffers an actionable injury. *See id.* at 1104.[14] "And so the same language also suggests that a qualified individual suffers new discrimination and a new injury each day that she cannot utilize a non-compliant service, program, or activity—even if the barriers giving rise to her claim were ones she encountered before." *Id.* Moreover, the Supreme Court "recognized 'that [a] failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion,'" demonstrating that Title II "imposes 'an affirmative obligation to accommodate persons with disabilities.'" *Id.* at 1104–05 (quoting *Tennessee v. Lane*, 541 U.S. 509, 531, 533 (2004)).

---

[14] Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Likewise, § 504 of the Rehabilitation Act mandates in part that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

We also examined the broader context of the two statutes. Regarding the ADA, we noted that Congress enacted the statute to "assure . . . full participation" of "individuals with disabilities" in society. *Id.* at 1106 (quoting 42 U.S.C. § 12101(a)(7)). And concerning the Rehabilitation Act, Congress similarly hoped to achieve the "full [societal] inclusion and integration" of disabled individuals. *Id.* (quoting 29 U.S.C. § 701(a)(6)(B)). We found those goals "consistent with and suggestive of the repeated violations doctrine." *Id.* Thus, we held:

> [E]ach time a qualified individual with a disability encounters or "actually become[s] aware of" a non-compliant service, program, or activity "and is thereby deterred" from utilizing that service, program, or activity, he or she suffers discrimination and a cognizable injury. So long as the service, program, or activity remains non-compliant, "and so long as a plaintiff is aware of [that] and remains deterred," the qualified individual's injury repeats.

*Id.* at 1107 (second and third alterations in original) (quoting *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1136–37 (9th Cir. 2002)).

Following *Hamer*, we also extended the repeated violations doctrine to claims brought under 42 U.S.C. § 1983. *See Herrera*, 32 F.4th at 986. In *Herrera*, the plaintiffs alleged that the City of Espanola violated their constitutional rights by turning off the water supply to their home and refusing to resume service unless the plaintiffs paid an outstanding water bill that the previous residents had accrued. *See id.* at 986–88. The district court dismissed their claims as untimely, concluding that their claims first accrued when they notified the city that its policy violated their constitutional rights and, consequently, that they had failed to bring their claims

26

within the applicable limitations period. *See id.* at 989. We reversed, holding that the claims were timely under the repeated violations doctrine. *See id.* at 999–1001. As we explained, the plaintiffs' claims first arose when the city terminated water service to their home based on the previous resident's outstanding bill. *See id.* at 1001. "And each day the City failed to provide water service to [the plaintiffs] constituted a separate violation that triggered a new limitations period." *Id.* In short, we explained that the repeated violations doctrine applies when "[a]ppellants challenge a series of unlawful acts each of which constitutes an alleged violation." *Id.* at 999.

We believe that the logic and reasoning of *Hamer* and *Herrera* map onto the circumstances before us. And we conclude that Wyo-Ben's claim is timely under the repeated violations doctrine.

**a**

More specifically, the plain language and statutory context of § 706(1) and the relevant appropriations acts, *see Hamer*, 924 F.3d at 1103–07, bolster Wyo-Ben's position that the repeated violations doctrine applies here. Begin with § 706(1). Similar to Title II of the ADA and § 504 of the Rehabilitation Act in *Hamer*, *see id.* at 1104, the language of § 706(1) applies to present and ongoing violations. Section 706(1) authorizes the court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). This provision authorizes courts to compel action that the agency continues to withhold unlawfully or delay unreasonably. As both a practical and legal matter, the court could not compel action

that the agency unlawfully withheld or unreasonably delayed in the past but then subsequently performed. *Cf. Brown v. Buhman*, 822 F.3d 1151, 1166 (10th Cir. 2016) ("[A] case becomes moot when a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision." (quoting *Ind v. Colo. Dep't of Corr.,* 801 F.3d 1209, 1213 (10th Cir. 2015))).

Moreover, as with Title II of the ADA, the relevant appropriations statutes at issue here create "an affirmative duty" to act. *Hamer*, 924 F.3d at 1105. In *Mt. Emmons*, we held that "the provision [adopting the exemption from the moratorium] clearly *requires* the Secretary to determine . . . whether the application is complete in that the applicant has complied with all requirements for *applying* for a patent." 117 F.3d at 1171. The Secretary therefore has an affirmative duty to determine whether an application qualifies for the exemption. *See id.* at 1172–73 (ordering the Secretary to "continue processing Mt. Emmons' patent application to determine whether it is sufficiently complete to qualify for the § 113 exemption").

And "the broader statutory context," *Hamer*, 924 F.3d at 1106, underlying the relevant appropriations acts demonstrates that they impose a continuing duty to determine whether pending applications are exempt from the moratorium. When Congress reenacted the moratorium and exemption for the fiscal year ending September 30, 1996, it included a provision requiring the Secretary to develop a plan to review 90% of the pending applications within five years and to carry out the plan. *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. 104-134, Department of the Interior and Related Agencies Appropriations Act, 1996, tit.

28

III, § 322(c), 110 Stat. 1321, 1321-203–1321-204 (Apr. 26, 1996) ("1996 Act"); *see also* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, Department of the Interior and Related Agencies Appropriations Act, 1997, tit. III, § 314(c), 110 Stat. 3009, 3009-221–3009-222 (Sept. 30, 1996) ("1997 Act") (requiring the Secretary to review 90% of the pending applications within five years after Congress enacted the 1997 Act).

By 2001, the Secretary had not reviewed 90% of the pending applications as required, and Congress did not enact a new deadline. But in each subsequent appropriations act through 2019, Congress required the Secretary to submit a report by the end of the fiscal year documenting the Secretary's progress toward completing the plan submitted in accordance with the 1997 Act. *See, e.g.*, Department of the Interior and Related Agencies Appropriations Act, 2002, Pub. L. No. 107-63, tit. III, § 309(c), 115 Stat. 414, 465 (Nov. 5, 2001); Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, div. E, tit. IV, § 407(c), 125 Stat. 786, 1038 (Dec. 23, 2011); 2019 Act, § 404(c). By reenacting the exemption annually and requiring reports on progress toward completing a plan that the Secretary first submitted in 1997, Congress evidently imposed an ongoing duty to review pending applications.[15]

---

[15]　　As is common when Congress enacts appropriations legislation, in many instances gaps exist between the dates on which an appropriations act expired and the next year's act took effect. These gaps run from several days to nearly seven months. *Compare* Department of Interior and Related Agencies Appropriations Act, 2001, Pub. L. No. 106-291, 114 Stat. 922 (Oct. 11, 2000) (enacting Department of the Interior appropriations for fiscal year ending September 30, 2001), *with* Department of Defense and Full-Year Continuing Appropriations Act, 2011, Pub. L. No. 112-10, div. B, tit. I, § 1101, 125 Stat. 38, 102 (Apr. 15, 2011) (extending fiscal year 2010

As we explained in *Hamer*, "[f]ailing to act in the face of an affirmative duty to do so axiomatically gives rise to liability." 924 F.3d at 1105. And "if the actor under the affirmative duty *keeps* failing to act while the underlying problem remains unremedied," then the repeated instances of inaction constitute new violations. *Id.*; *see also Pit River Tribe,* 512 F. Supp. 3d at 1064–65 (holding § 706(1) claim seeking to compel BLM to ensure compliance with certain statutory and regulatory requirements was timely notwithstanding the six-year statute of limitations in § 2401(a) because "[e]ach day that BLM fails to ensure compliance with the [relevant] requirements constitutes a single, discrete violation of the statute").

In sum, the repeated violations doctrine fits the circumstances that Wyo-Ben alleges in its complaint.[16]

---

appropriations act for Department of the Interior to apply in fiscal year 2011). At most, these gaps demonstrate that new, separate violations did not occur when an appropriations act containing the moratorium and exemption was not in effect. Nevertheless, going back to fiscal year 1995, there were a substantial number of days each year when the duty was in effect and the Secretary failed to review Wyo-Ben's application. Moreover, by repeatedly reenacting the exemption along with a requirement that the Secretary report annually on progress toward completing the plan developed in 1997, Congress demonstrated its intent that the Secretary continue to review pending applications on an ongoing basis until the queue is eliminated.

[16]    The district court did not apply the repeated violations doctrine based in part on its conclusion that *Hamer* applies only to claims under the ADA and the Rehabilitation Act. *See* Aplt.'s Opening Br., Ex. 1 at 20. In *Hamer*, we held "that the repeated violations doctrine applies to claims under Title II of the Americans with Disabilities Act and section 504 of the Rehabilitation Act of 1973." 924 F.3d at 1103. But we did not hold that the doctrine applies *only* to those statutes, and we have since extended the doctrine to claims asserted under statutes beyond those at issue in *Hamer*. *See Herrera*, 32 F.4th at 995 (concluding the repeated violations

Under those allegations, the Secretary has an affirmative, ongoing duty to review pending applications. *See, e.g.*, *Mt. Emmons*, 117 F.3d at 1171; 2019 Act, § 404(b)–(c). Once the Secretary had allegedly withheld action unlawfully or delayed unreasonably in reviewing Wyo-Ben's application, each time the Secretary continued thereafter to violate its duty to review the application constituted a discrete instance of "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *see also Herrera*, 32 F.4th at 1001 ("[E]ach day the City failed to provide water service to Appellants constituted a separate violation that triggered a new limitations period.").

**b**

Because the repeated violations doctrine implies that at some point an initial violation occurred, we identify the initial violation Wyo-Ben alleges in its complaint. *See Hamer*, 924 F.3d at 1097 (implying that a public entity first "violate[s] Title II and section 504 . . . when it initially constructs or creates a non-compliant service, program, or activity"); *see also Herrera*, 32 F.4th at 1001 (explaining that the plaintiffs' "§ 1983 claims based on the City policy conditioning the provision of water service on payment of the prior account holder's arrearages arose upon the City's termination of water service"). Identifying the initial violation will then allow

doctrine applies to § 1983 claims). As we explain herein, the doctrine we applied in *Hamer* and *Herrera* readily extends to Wyo-Ben's claim under § 706(1) of the APA.

31

us to determine the period during which the violations repeated and for which Wyo-Ben may recover.

"[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *SUWA*, 542 U.S. at 64. If the plaintiff plausibly alleges both elements identified in *SUWA*, the court must then determine whether the agency "unlawfully withheld" or "unreasonably delayed" in carrying out its duty. 5 U.S.C. § 706(1).

Though we do not address the viability of Wyo-Ben's § 706(1) claim on the merits, we are able to discern from the complaint allegations of an initial violation such that the repeated violations doctrine comes into play. Wyo-Ben alleges that the Secretary had a mandatory duty under the relevant appropriations acts to review its application in order to determine whether it is exempt from the moratorium, *see* Aplt.'s App., Vol. I, at 10, thereby invoking the elements adopted in *SUWA*, *see* 542 U.S. at 64. And Wyo-Ben also alleges that the Secretary "unlawfully withheld" and "unreasonably delayed" in exercising her statutory duty. *See* Aplt.'s App., Vol. I, at 10–11.

With respect to agency action "unlawfully withheld," we can reasonably construe the complaint as alleging that the Secretary first "unlawfully withheld" action when the 1995 Act expired. Specifically, Wyo-Ben alleges that Congress first enacted the moratorium and exemption in the 1995 Act and reenacted them annually

32

through fiscal year 2019,[17] and it alleges that the Secretary's failure to determine whether its application qualifies for the exemption, as required under each appropriations act, amounted to agency action "unlawfully withheld." *See id.* Further, on appeal, Wyo-Ben argues that the Secretary's failure to act as required under any of the appropriations statutes enacted prior to the 2019 Act amounted to "separate and discrete" violations. *See* Aplt.'s Opening Br. at 41; *see also* Aplt.'s Reply Br. at 21 ("[E]ach time the Secretary unlawfully withheld action required by the statute governing a given year constituted a separate, discrete repeated violation.").[18]  In other words, if the Secretary unlawfully withheld action by the end

---

[17]    Wyo-Ben also alleges that Congress extended the moratorium and exemption provisions enacted in fiscal year 2019 through the end of fiscal year 2020. *See* Aplt.'s App., Vol. I, at 10 (citing Continuing Appropriations Act, 2020, and Health Extenders Act of 2019, Pub. L. No. 116-59, §§ 101(7) and 104, 133 Stat. 1093, 1093–95 (Sept. 27, 2019)).

And we also note that Congress has continued to reenact the moratorium and exemption in each appropriations act through the present fiscal year. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. G, tit. IV, §§ 404(a)–(b), 134 Stat. 1182, 1535 (Dec. 27, 2020); Aplt.'s 28(j) Letter at 1 (filed Feb. 15, 2023) (first citing Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. G, tit. IV, §§ 404(a)–(b), 136 Stat. 49, 409 (Mar. 15, 2022); and then citing Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. G, tit. IV, §§ 404(a)–(b) (Dec. 29, 2022)).  Though these subsequent reenactments carry limited relevance for our resolution of the present appeal, they do demonstrate that this matter is not moot given that Congress has continued to impose the same duty on the Secretary.

[18]    As we discuss further *infra*, Wyo-Ben appears to have taken a more limited view of the temporal unit for repetition of "unlawfully withheld" violations than our caselaw would seem to require, centering the violation on each fiscal year. *But cf. Hamer*, 924 F.3d at 1105 (concluding that the defendant city "commit[ted] a 'new violation' each *day* that it fail[ed] to remedy [the] non-compliant service, program, or activity" (emphasis added)).

33

of each relevant fiscal year, then—according to Wyo-Ben's theory—the Secretary

necessarily unlawfully withheld action for the first time by the end of fiscal year

1995. We therefore construe the complaint as alleging that the Secretary first

"unlawfully withheld" action by failing to exercise her duty under the 1995 Act.[19]

---

[19] In *Mt. Emmons*, where the Secretary had "unlawfully withheld" agency action by failing to review the plaintiff's application, the Secretary had affirmatively disavowed his responsibility to review the plaintiff's application by issuing an interpretive memorandum under which the plaintiff's application was not subject to review. *See* 117 F.3d at 1168–69 (explaining the Secretary's interpretive memorandum only permitted review of applications for which a FHFC was signed by October 1, 1994, or for which a FHFC was pending in Washington, D.C., by September 30, 1994, neither of which covered the plaintiff's application). We are unable to glean anything from the record suggesting that, in the years after we decided *Mt. Emmons*, the Secretary affirmatively disavowed her duty to review Wyo-Ben's application. Rather, Wyo-Ben alleges that the Secretary simply failed to do so. *See* Aplt.'s App., Vol. I, at 10 (alleging that "[t]he Secretary has not applied the criteria required by applicable law to determine whether" Wyo-Ben's application qualifies for the exemption "and will not make that determination unless required to do so by [the district court]," without identifying a particular action or policy through which the Secretary affirmatively disavowed her duty to review the application). Therefore, it is not clear under what mechanism the Secretary purported to withhold action in each fiscal year after *Mt. Emmons* invalidated the Secretary's interpretive memorandum. This is a matter that the parties and the district court will need to address in resolving Wyo-Ben's claim on the merits.

Furthermore, we note that we decided *Mt. Emmons* two years before *Forest Guardians*, where we held that agency action "unlawfully withheld" may arise "when an [agency] . . . fails to comply with a statutorily imposed absolute deadline." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999). On the record before us, Wyo-Ben does not identify a statutory deadline by which the Secretary was required to review its application in any of the relevant appropriations acts. Whether there is any tension between the decision in *Mt. Emmons*, holding that the Secretary had "unlawfully withheld" agency action by explicitly disavowing his duty to review pending applications, *see* 117 F.3d at 1168–69, and our subsequent decision in *Forest Guardians*, which seemingly indicates that violating a statutory deadline is the typical mechanism by which an agency withholds action unlawfully, is a question that we leave for consideration in the first instance (if at all) by the district court in the merits phase of this litigation.

Wyo-Ben also alleges that the Secretary delayed unreasonably in carrying out her duty. In its complaint, Wyo-Ben alleges that the "Secretary's failure to apply the criteria required by applicable law . . . constitutes agency action . . . unreasonably delayed within the meaning of Section 706(1)." Aplt.'s App., Vol. I, at 10–11. Wyo-Ben does not allege precisely when the Secretary's delay in reviewing its application first became "unreasonable," and unlike agency action "unlawfully withheld," Wyo-Ben does not suggest anywhere in the record that the delay became unreasonable by the end of fiscal year 1995. *Cf.* Aplt.'s Reply Br. at 21 (arguing that the Secretary "unlawfully withheld" action each fiscal year he or she failed to review Wyo-Ben's application). But we can infer Wyo-Ben's position to be that, at the latest, the delay became unreasonable by the time the 2019 Act went into effect.

The complaint alleges that Congress first established the Secretary's duty in the 1995 Act and that the Secretary's failure to review its application as required under the 2019 Act amounted to agency action "unreasonably delayed." *See* Aplt.'s App., Vol. I, at 10–11. Notably, Wyo-Ben argues that the Secretary's inaction during the period when the 2019 Act was in effect constituted a *repeated* violation, *see* Aplt.'s Opening Br. at 41—implying that an unreasonable delay had materialized by the time the 2019 Act took effect. Stated otherwise, given that the duty first arose under the 1995 Act, and Wyo-Ben alleges that the Secretary delayed unreasonably by failing to review its application during fiscal year 2019, we construe the complaint as alleging a delay that became unreasonable, at the latest, by the time the 2019 Act went into effect. We do not rule out the possibility that the delay first became

35

unreasonable before then.  Nevertheless, that the initial violation allegedly materialized by the time the 2019 Act went into effect suffices for purposes of applying the repeated violations doctrine on the alleged facts before us.

c

We thus have determined that Wyo-Ben alleges an initial violation of § 706(1). We turn next to examine the temporal unit by which repeated violations are measured under the circumstances here.

We begin with the claim that the Secretary "unlawfully withheld" agency action.  As explained previously, we construe the complaint as alleging that the Secretary first withheld action unlawfully by the time the 1995 Act expired.  We believe that either of two plausible approaches satisfies the repeated violations doctrine.  Under one approach, after the 1995 Act expired, the Secretary allegedly committed a new and discrete violation each *day* that the duty remained in place and the Secretary failed to review Wyo-Ben's application.  This approach follows naturally from our precedent.  *See Hamer*, 924 F.3d at 1103 (explaining that "a public entity repeatedly violates [Title II of the ADA and Section 504 of the Rehabilitation Act] *each day* that it fails to remedy a non-compliant service, program, or activity" (emphasis added)); *Herrera*, 32 F.4th at 1001 (same with respect to constitutional violations asserted under § 1983).

Under a second, more limited approach, after the 1995 Act expired, the Secretary committed a new and discrete violation at the end of each fiscal *year* the Secretary failed to carry out the requisite review.  Wyo-Ben appears to adopt this

36

latter approach on appeal. *See, e.g.*, Aplt.'s Opening Br. at 41 (explaining that a "violation of any one of" the statutes enacted prior to the 2019 Act "is necessarily separate and discrete"); Aplt.'s Reply Br. at 21 (arguing "each time the Secretary unlawfully withheld action required by the statute governing a given *year* constituted a separate, discrete repeated violation" (emphasis added)); *id.* (arguing "the Secretary's unlawful inaction causes Wyo-Ben a new, discrete . . . injury every *year*" (emphasis added)). For purposes of our analysis, we assume that this is so. But under either approach, Wyo-Ben has alleged an initial instance in which the Secretary "unlawfully withheld" required action and subsequent, discrete instances in which the Secretary repeatedly failed to carry out her duty up to the time of the 2019 Act. That suffices for timeliness under the repeated violations doctrine.

We also conclude that the repeated violations doctrine applies to Wyo-Ben's claim of unreasonable delay. As we explained, although Wyo-Ben does not specify the precise point at which the Secretary's delay first became unreasonable—that is, the temporal point where the initial violation occurred—we construe the complaint as alleging that the delay became unreasonable by the time the 2019 Act went into effect. After the violation first materialized, each subsequent day that the Secretary failed to carry out her duty constitutes a discrete violation that would seemingly be actionable under § 706(1). *See Hamer*, 924 F.3d at 1103; *Herrera*, 32 F.4th at 1001. Unlike the claim for action "unlawfully withheld," we believe days are appropriate units by which to delineate repeated violations in the context of an unreasonable delay. Whereas Wyo-Ben apparently takes the position that the Secretary

37

"unlawfully withheld" agency action each fiscal year she failed to review Wyo-Ben's application, we do not detect any similar, end-of-fiscal-year allegations concerning unreasonable delay. We therefore follow *Hamer* and *Herrera* in characterizing the "repeated" violation as each day the Secretary failed to review Wyo-Ben's application after the point at which her delay first became unreasonable. *See* 924 F.3d at 1103; 32 F.4th at 1001.

In sum, the repeated violations doctrine applies here. A violation allegedly arose when the Secretary first unlawfully withheld or unreasonably delayed in taking agency action by failing to review Wyo-Ben's application. Each day—or, as to action "unlawfully withheld," fiscal year—that the Secretary delayed or withheld its review after the initial violation materialized constitutes a separate alleged violation under § 706(1) of the APA. Thus, the district court erred in holding that Wyo-Ben's § 706(1) claim was untimely.

**d**

We conclude our discussion of the statute of limitations by briefly addressing the applicable recovery period. Under the repeated violations doctrine, plaintiffs may recover "for only that part of the injury the plaintiff suffered during the limitations period," stretching back in time from the date the plaintiff filed suit. *Hamer*, 924 F.3d at 1100, 1103 (quoting *White*, 129 F.3d at 1430); *see also Herrera*, 32 F.4th at 1000 (explaining that "the repeated violation[s] doctrine . . . limits [plaintiffs'] damages to the [statute-of-limitations] period preceding initiation of the action"). Plaintiffs may not "recover[] for the part of the injury suffered outside of the

38

limitations period." *Hamer*, 924 F.3d at 1100. Applying *Hamer*, Wyo-Ben maintains that the repeated violations doctrine authorizes recovery for injuries dating back six years from the day it filed its complaint—that is, October 17, 2013. *See* Aplt.'s Opening Br. at 42; *id.* at 32–33 (quoting *Hamer*, 924 F.3d at 1097); *see also* 28 U.S.C. § 2401(a) (setting the limitations period at six years).

Although Wyo-Ben invokes *Hamer* in demarcating the relevant recovery period, its complaint differs from that case and *Herrera* in a critical respect. The plaintiffs in *Hamer* and *Herrera* both sought money damages and argued that they experienced repeated compensable injuries over periods spanning at least several months, in *Hamer*, and several years, in *Herrera*. *See* 924 F.3d at 1098; 32 F.4th at 987–88. Identifying the relevant recovery period was therefore essential in determining the amount of damages the plaintiffs could recover. By contrast, Wyo-Ben does not seek damages in its complaint. *See* Aplt.'s App., Vol. I, at 11. It asserts a single claim under § 706(1) and—consistent with the relief available under that provision—requests an "order requiring the [Secretary] to review [its] Application to determine whether it qualifies for the Section 404(b) exception to the Temporary Moratorium." *Id.* Wyo-Ben requests, in effect, an injunction requiring the Secretary to review its application. Unlike the damages actions at issue in *Hamer* and *Herrera*, a court can award the relief Wyo-Ben requests without regard to any particular recovery period.

Nevertheless, we leave open the possibility that a recovery period will become relevant on remand. For instance, Wyo-Ben also "requests such other and additional

39

relief as the Court deems proper." *Id.* If the district court awards additional relief and the scope of that relief depends on the relevant period of recovery, the principles set forth in *Hamer* and *Herrera* govern. Wyo-Ben may only recover for injuries it incurred after the point at which the Secretary first "unlawfully withheld" action or "unreasonably delayed" in reviewing Wyo-Ben's application. *See Herrera*, 32 F.4th at 1001 (finding plaintiffs could recover for damages incurred after the unlawful condition first "arose"). As we have explained, that point may differ depending on whether the district court finds the Secretary's action was "unlawfully withheld" or "unreasonably delayed." Further, Wyo-Ben may only recover for injuries it incurred stretching back six years from the date it filed suit. *See, e.g.*, *Hamer*, 924 F.3d at 1100; 28 U.S.C. § 2401(a). It may not recover for any injuries outside the six-year limitations period. *See Hamer*, 924 F.3d at 1100.

## C

Because we conclude the district court erred in dismissing Wyo-Ben's complaint as untimely, we next turn to Wyo-Ben's request that we compel Respondents to act. Specifically, Wyo-Ben argues that "the omitted action is both discrete and required by law," and "because the dispositive facts are undisputed," it maintains "the district court erred by failing to" compel the Secretary to carry out her duty under the 2019 Act. Aplt.'s Opening Br. at 44 (citing *SUWA*, 542 U.S. at 55); *id.* at 46. Accordingly, Wyo-Ben requests that we compel the Secretary to review its patent application. *See id.* at 46. This we decline to do. Contrary to Wyo-Ben's

40

assertions, there remain factual disputes and issues on which we currently lack adequate briefing to address.

Two factors are relevant in determining whether an application is exempt from the moratorium. First, "the application must [have] be[en] filed with the Secretary on or before the date" on which the 1995 Act took effect. *Mt. Emmons*, 117 F.3d at 1170. Filing a patent application with a BLM state office satisfies this condition. *See id.* To satisfy the second condition, the applicant must have fulfilled all relevant statutory requirements before September 30, 1994. *See id.* at 1170–71. For placer claims like Wyo-Ben's, the relevant statute—30 U.S.C § 35—requires the applicant to tender "payment of the purchase price." *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1066 (9th Cir. 1997); *see also Mt. Emmons*, 117 F.3d at 1171 (explaining that the "application is not 'complete' so as to qualify for continued processing under § 113 if purchase price is not paid").

On appeal, Respondents maintain that (1) Wyo-Ben submitted an incomplete application in that BLM rejected its tender of the purchase price before the moratorium took effect, and (2) BLM properly determined in 1994, pursuant to authority the Secretary lawfully delegated to BLM, that Wyo-Ben's application falls within the moratorium. *See* Aplees.' Resp. Br. at 45–48. The district court did not resolve either of the foregoing two issues in dismissing Wyo-Ben's claim. And, more specifically as to the second issue, the court did not determine whether the lawful effect of any such delegation from the Secretary was that BLM properly stood

41

in the shoes of the Secretary for purposes of determining that Wyo-Ben's application was subject to the moratorium.

"Where an issue has not been ruled on by the court below, we generally favor remand for the district court to examine the issue." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1227 (10th Cir. 2013); *see also Kerr v. Hickenlooper*, 824 F.3d 1207, 1217 (10th Cir. 2016) ("Appellate courts have 'discretion to remand issues . . . to the trial court when that court has not had the opportunity to consider the issue in the first instance.'" (quoting *Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot.*, 550 F.3d 1121, 1134 (Fed. Cir. 2008))); *cf. Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); *Tae Chon v. Obama*, 718 F. App'x 653, 660 (10th Cir. 2017) (unpublished) ("It is certainly preferable for an appellate court considering a claim to have the benefit of 'a reasoned district court decision resolving it.'" (quoting *Sylvia v. Wisler*, 875 F.3d 1307, 1326 (10th Cir. 2017))).

Accordingly, we remand the action to the district court for further proceedings. If the district court does have occasion to address Wyo-Ben's claim on the merits, the court should consider, among other issues it finds relevant: (1) whether Wyo-Ben's application was incomplete according to the relevant statutory criteria; and (2) whether the Secretary lawfully delegated authority to BLM to determine whether an application falls within the moratorium or qualifies for the exemption—such that the BLM's action is, in lawful effect, the action of the Secretary. If the district court determines that the statute required the Secretary (rather than the BLM) to review

Wyo-Ben's application, the court must then decide the merits—that is, whether the Secretary "unlawfully withheld" or "unreasonably delayed" in taking the requisite action.

## IV

For the foregoing reasons, we **REVERSE** the district court's dismissal of Wyo-Ben's complaint as untimely.  We **REMAND** the case for further proceedings consistent with this opinion.